**ABBOTT LABORATORIES,**
**Plaintiff–Appellant,**

v.

**MEAD JOHNSON & COMPANY,**
**Defendant–Appellee.**

No. 91–3492.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1992.
Decided July 23, 1992.

7

8

Thomas G. Stayton, Baker & Daniels, Indianapolis, Ind., Robert F. Ward, Pope, Ballard, Shepard & Fowle, Chicago, Ill., Thomas C. Morrison (argued), Andrew D. Schau, Robert W. Lehrburger, Patterson, Belknap, Webb & Tyler, New York City, Kenneth D. Greisman, Mark E. Barmak, Abbott Laboratories, Dept. 324, Abbott Park, Ill., for plaintiff-appellant.

Jerold S. Solovy, Robert L. Byman (argued), James L. Thompson, Daniel S. Goldman, Jenner & Block, Chicago, Ill., Evan E. Steger, Harry L. Gonso, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendant-appellee.

Before FLAUM, EASTERBROOK and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Abbott Laboratories (Abbott) filed this interlocutory appeal, 28 U.S.C. § 1292(a)(1), after the district court denied its motion for a preliminary injunction against Mead Johnson & Company (Mead). Abbott seeks relief under § 43(a) of the Lanham Act (the Act), 15 U.S.C. § 1125(a), to halt Mead's alleged false advertising and trade dress infringement practices in the oral electrolyte maintenance solution (OES) market. We vacate the district court's denial of preliminary relief, and remand with directions to promptly commence a full trial on the merits.

## I.

Oral electrolyte maintenance solutions are over-the-counter medical products used to prevent dehydration in infants suffering from acute diarrhea or vomiting. They are clear liquids, comprised almost exclusively of water, electrolytes and dissolved carbohydrates, and are ingested orally. While OES products do not actually cure diarrhea or nausea, they maintain the fluid balance of infants inflicted with these maladies by facilitating the body's absorption of fluids and electrolytes. The OES market is a small (approximately $45 million in annual sales) but important one; dehydration is an especially dangerous medical problem for infants, and as many as ten percent of preventable postnatal infant deaths result from the collateral effects, such as dehydration, of diarrhea. John D. Snyder, *Use and Misuse of Oral Therapy for Diarrhea: Comparison of U.S. Practices with American Academy of Pediatrics Recommendations*, Pediatrics, Jan. 1991, at 28. Despite their medical significance, OES products may be purchased without a prescription at food and drug stores.

Abbott and Mead are, for all practical purposes, the only two competitors in the United States OES market. Abbott's product is called "Pedialyte," while Mead's is called "Ricelyte". Competition in this market is of surprisingly recent vintage, as Pedialyte enjoyed a virtual monopoly until Mead introduced Ricelyte in 1990. The two products are virtually identical; only their carbohydrate components differ. This difference is crucial to understanding the dispute in this case, so we briefly provide some background.

Pedialyte is known as a "glucose-based solution" because its carbohydrate component is glucose. Glucose is a monomer. Monomers are the simplest carbohydrate molecules, and serve as the building blocks for larger carbohydrates, known as oligimers or polymers. Commonly known larger carbohydrates include sucrose (*i.e.*, table sugar), comprised of two glucose molecules bonded together, and starch, comprised of thousands of monomers bonded together. When a person ingests complex carbohydrates like starch, the body's digestive system breaks them down, by a process called hydrolysis, into monomers for absorption into the bloodstream via the small intestine.

Ricelyte, unlike Pedialyte, is not a glucose-based solution, for it is manufactured with carbohydrates known as "rice syrup solids." When producing Ricelyte, Mead takes whole rice kernels and separates out the two carbohydrates, amylose and amylopectin, found naturally in rice. Amylose and amylopectin, like starch, are complex carbohydrates comprised of thousands of monomers bonded together. Mead then hydrolyzes the rice carbohydrates—biochemists have long known how to replicate natural hydrolysis in the laboratory—into rice syrup solids, which are much shorter polymer chains, but still more complex than the monomer glucose. It is important for our purposes to emphasize that rice syrup solids, while hydrolytically *derived* from rice carbohydrates, are not actually "rice carbohydrates" as the term is used in the scientific and medical communities. The difference is analogous to that between an automobile engine and a vat of molten

steel. One may produce molten steel from an engine by melting it down, but the two are completely different things, both physically and functionally.

The OES market, unlike typical consumer product markets, is "professionally driven," meaning that Abbott and Mead do not promote their product directly to consumers, but rather to physicians and nurses, who in turn recommend them to consumers. As is standard practice in the medical products field, both companies send sales representatives to visit physicians, primarily pediatricians, to tout the superiority of their respective products. Both companies also distribute brochures to physicians and place most of their print advertising in medical journals rather than in more broadly based media venues. The plan, apparently, is to convince physicians and nurses to suggest one product rather than the other when approached by parents whose infants are suffering from diarrhea or nausea. This initial recommendation is crucial because parents usually accept their physician's initial recommendation, and furthermore tend to stick with the same product should the problem recur.

Since Pedialyte is the incumbent and Ricelyte the challenger, Mead launched a promotional campaign designed to convince physicians and nurses to recommend Ricelyte over Pedialyte. The campaign does so by emphasizing that Ricelyte's carbohydrate components (i.e., rice syrup solids) come from rice, while Pedialyte's carbohydrate component is glucose. Mead focuses on rice for a fairly simple reason. Over the past decade, medical researchers worldwide, many sponsored by the World Health Organization (WHO), have studied the effectiveness of OES products made with powdered whole grains of rice, which are known as "rice-based," or whole grain, solutions. These studies have found that rice-based solutions have significant advantages over glucose-based solutions, like Pedialyte, when it comes to combatting the

dehydrative effects of diarrhea. Despite their medical superiority, however, rice-based solutions face two obstacles to commercial viability. First, rice grain powder, unlike glucose and rice syrup solids, cannot be completely dissolved in water, making rice-based solutions cloudy and susceptible to separation, and less palatable to consumers as a result.[1] Second, rice-based solutions are subject to early spoilage, and hence have too brief a shelf life for commercial distribution.

Ricelyte, according to Mead, fashions a compromise between the marketability and appearance of glucose-based solutions and the medical effectiveness of whole grain solutions. Its rice syrup solids are derived from rice, but are soluble and do not spoil, making Ricelyte more marketable than whole grain solutions. There remain, however, significant differences between Ricelyte and rice-based solutions. As noted, the carbohydrate components of rice-based solutions are actual rice carbohydrates (i.e., amylose and amylopectin), not the less complex rice syrup solids used in Ricelyte. Moreover, rice-based solutions, unlike Ricelyte, also contain the non-carbohydrate components of rice, including proteins, fats, fiber and other organic materials.

Nonetheless, Mead's promotional campaign plays up Ricelyte's association with rice. First, it forges a direct link between Ricelyte and rice. To take an obvious example, the name "Ricelyte" conveys the message that the product contains or is made from rice. Further, some of Mead's advertisements describe Ricelyte as a "rice-based oral electrolyte solution," while others claim that Ricelyte contains "rice carbohydrate molecules." The visual background of many advertisements consists of an illustration of rice grains cascading into a clear liquid pool. Second, Mead's campaign implies, and at times directly states, that Ricelyte's link to rice makes it superior to Pedialyte. Some advertisements pro-

---

1. Calling rice-based or whole-grain solutions "solutions" is somewhat of a misnomer. As chemists use the term, "solutions," such as Tang, are clear and do not separate out into their solid and liquid components. Rice-based solutions are actually "suspensions," which, like fresh-squeezed orange juice, must be mixed or shaken to evenly distribute the non-liquid component, and even then remain cloudy.

claim that "worldwide results confirm the benefits of rice" and that rice "has been used for centuries to help manage diarrhea." The statement "Rice Makes A Difference" appears in nearly all Ricelyte advertisements, in most instances as a subtitle to "New Ricelyte." In addition, a number of ads tout certain (alleged) specific benefits of Ricelyte vis-a-vis Pedialyte, including lower osmolality, better fluid absorption, and reduced stool output—all the consequence of Ricelyte's link to rice.

Abbott did not take kindly to Mead's promotional and advertising campaign. It filed suit, alleging that the campaign, up to and including the "Ricelyte" name, was false and misleading in violation of § 43(a)(2) of the Act. Abbott also alleged that Ricelyte's bottle, label and overall packaging infringed upon Pedialyte's trade dress in violation of § 43(a)(1) of the Act. Abbott asked for a preliminary injunction, seeking a wide variety of relief, ranging in severity from a product recall to modifications in Mead's advertising and promotional materials. The district court approved an expedited discovery schedule submitted by the parties, held a ten-day evidentiary hearing, and heard one day of oral argument. Shortly thereafter it issued an order, accompanied by a lengthy and thorough memorandum opinion, denying Abbott's preliminary injunction motion in full. *Abbott Laboratories v. Mead Johnson & Co.*, No. IP 91–202C (S.D.Ind. Oct. 10, 1991) (hereinafter "Dist. Op.").

The court's analysis followed the venerable four-part preliminary injunction standard, *see, e.g., Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986), about which we speak at greater length in the following section. With regard to the false advertising claim under § 43(a)(2), the court ruled that Abbott had established a likelihood of success on the merits. It found certain of Mead's advertisements, including those claiming that Ricelyte is "rice-based", to be literally false, and others, including those maintaining that Ricelyte has a lower osmolality than Pedialyte, to be literally true but misleading. Nonetheless, the court declined to enjoin Mead's promotional campaign pending a full trial because the other three preliminary injunction factors tipped the equities in Mead's favor: (1) if Abbott were to prevail on the merits, any harm it would suffer prior to final judgment could be adequately compensated with money damages and would not be irreparable; (2) the balance of hardships favored Mead; and (3) the public interest would be disserved by a preliminary injunction. With regard to the trade dress claim under § 43(a)(1), the court held that Abbott had not established a likelihood of success on the merits because Pedialyte's trade dress was "functional," and therefore did not order Mead to modify Pedialyte's packaging. Abbott appealed.

## II.

Despite our recent efforts to clarify the law of preliminary injunctions, *see, e.g., Lawson Prods., Inc. v. Avnet, Inc., supra; American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589 (7th Cir.1986); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir.1984), confusion persists, as demonstrated by the contrasting spins both parties place upon the four-part preliminary injunction standard. To guide our analysis, as well as assist litigants in future cases, we briefly outline the following precepts, and note the parties' deviation therefrom in the margin.

█ As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. *Lawson Prods.*, 782 F.2d at 1433; *Roland Mach.*, 749 F.2d at 386–87. If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning

the consequences of granting or denying the injunction to non-parties. *Lawson Prods.*, 782 F.2d at 1433; *Roland Mach.*, 749 F.2d at 387–88.

■■■ The court, sitting as would a chancellor in equity, then "weighs" all four factors in deciding whether to grant the injunction, seeking at all times to "minimize the costs of being mistaken." *American Hosp. Supply*, 780 F.2d at 593. We call this process the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side. *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1393 (7th Cir.1992); *Roland Mach.*,

749 F.2d at 387.[2] This weighing process, as noted, also takes into consideration the consequences to the public interest of granting or denying preliminary relief. *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371–72 (7th Cir.1989); *American Hosp. Supply*, 780 F.2d at 594, 601.[3] While we have at times framed the sliding scale approach in mathematical terms, *see American Hosp. Supply*, 780 F.2d at 593–94, it is more properly characterized as subjective and intuitive, one which permits district courts to "weigh the competing considerations and mold appropriate relief." *Lawson Prods.*, 782 F.2d at 1436.

We review a district court's decision to grant or deny a preliminary injunction under the abuse of discretion standard. *Id.*

2. Mead, pointing to an isolated dictum in *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 391 (7th Cir.1985), states that if the balance of irreparable harms (factor number 3 in the text) tips toward the defendant, the preliminary injunction must be denied regardless of the strength of plaintiff's case on the merits. This statement is erroneous. It is the balance of harms *discounted* by the parties' relative chances of succeeding on the merits (and taking account of the public interest), not the *undiscounted* balance of harms, that must weigh in plaintiff's favor for a preliminary injunction to issue. *Id.* at 392; *see also Diginet*, 958 F.2d at 1393; *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371–72 (7th Cir. 1989); *American Hosp. Supply*, 780 F.2d at 598; *Roland Mach.*, 749 F.2d at 392 ("when there is no clear balance of hardships in favor of the injunction, [plaintiff] must show that it is more likely than not to win" on the merits).

To buttress its position, Mead also relies upon a passage in *Diginet*, 958 F.2d at 1394, which reads: "Given the exceptionally one-sided balance of harms [in defendant's favor], it is plain that the injunction should not have been issued, regardless of the likely merits of the [plaintiff's] claim." When read in context, however, this passage does not support Mead's position. We characterized the balance of harms as "exceptionally one sided" because the plaintiff in *Diginet* failed to demonstrate that it would suffer *any* irreparable harm in the event preliminary relief were denied; in fact, we found that the plaintiff would *benefit* from a denial. *Id.* As such, the plaintiff could not clear the second preliminary injunction threshold (factor number 2 in the text), and hence was doomed to lose regardless of its chances of succeeding on the merits.

To illustrate our point, consider the following. Plaintiff X seeks a preliminary injunction against defendant Y. Suppose that the (undis-

counted) balance of irreparable harms tips slightly toward Y—in other words, that X will be irreparably harmed $9x$ if the court denies preliminary relief, while Y will be harmed $10x$ if the court grants it. Suppose further that X has a 99 percent chance of succeeding on the merits, Y a one percent chance, and that the public interest is not implicated by the case. The proper course in this instance—recognizing, of course, that quantifying the factors to this degree of precision is likely impossible—would be to grant preliminary relief, for that is the course that would minimize the cost of error. Weighing the equities *as a whole* favors X, making preliminary relief appropriate, even though the undiscounted balance of harms favors Y.

3. Both parties state that a plaintiff, to obtain a preliminary injunction, must show that the injunction would not harm the public interest. This, in effect, adds a third threshold to our preliminary injunction standard by making the public interest factor dispositive. Although the statement finds support from a dictum in *Brunswick Corp. v. Jones*, 784 F.2d 271, 274 n. 1 (7th Cir.1986) (as a prerequisite, plaintiff must establish that "an injunction would not harm the public interest"), we question whether it accurately characterizes the law of the circuit. The public interest is one factor courts must consider in weighing the equities; it is not dispositive. *Ping*, 870 F.2d at 1371–72; *American Hosp. Supply*, 780 F.2d at 601–02. Suppose, to take a simple example, that the balance of harms tips significantly in plaintiff's favor, that plaintiff has an overwhelming chance of succeeding on the merits, but that granting the injunction would ever so slightly impair the public interest (*e.g.*, by removing one of ten products from a given product market). In this instance, preliminary relief would be proper even though it might harm the public interest.

at 1436–37. With regard to analysis of each of the four factors, a court abuses its discretion when it commits a clear error of fact or an error of law. *Lawson Prods.*, 782 F.2d at 1437; *Roland Mach.*, 749 F.2d at 392. Absent any such error, the district court's ultimate weighing of all four factors is entitled to great deference; while our review is more searching than an examination of whether the district court weighed those factors "irrationally or fancifully," we may not "substitute our judgment" for that of the district court. *Roland Mach.*, 749 F.2d at 390; *see also Lawson Prods.*, 782 F.2d at 1437. With this standard in mind, we proceed to the case at hand.

### III.

The district court, as noted, denied Abbott's request to enter a preliminary injunction under § 43(a)(2) of the Act to halt Ricelyte's allegedly false and misleading promotional campaign. The court found that Abbott had demonstrated a likelihood of succeeding on the merits, but determined that the remaining three preliminary injunction factors favored Mead. We find that the court misconstrued the legal principles underlying each of those three factors, and hence that it abused its discretion in completely denying preliminary relief.

### A.

Section 43(a)(2) of the Act prohibits the use of false or misleading statements or representations of fact in commercial advertising, and establishes a private remedy for any violation thereof. The provision applies with equal force to (1) statements which are literally false and (2) statements which, while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir.1990); *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir.1986); *Vidal Sassoon, Inc. v. Bristol–Myers, Co.*, 661 F.2d 272, 277 (2d Cir.1981); *Guardsmark, Inc. v.*

*Pinkerton's Inc.*, 739 F.Supp. 173, 175 (S.D.N.Y.), *aff'd without opinion*, 923 F.2d 845 (2d Cir.1990); *cert. denied*, —— U.S. ——, 111 S.Ct. 2893, 115 L.Ed.2d· 1058 (1991). The district court determined that Abbott had established a likelihood of prevailing at trial on the merits. Mead, advancing an alternative ground for affirmance, contends otherwise. We consider separate aspects of Mead's promotional campaign in turn, keeping in mind throughout that to pass this threshold Abbott need only demonstrate some likelihood of prevailing on the merits, *Lawson Prods.*, 782 F.2d at 1433, not that it will definitely prevail.

■ *The "Rice Claims"*. First we examine what the district court referred to as Mead's "rice claims," *i.e.*, Mead's description of Ricelyte as a "rice-based oral electrolyte solution" and assertion that Ricelyte contains "rice carbohydrate molecules." The court concluded that the rice claims were literally false; we regard this conclusion as a finding of fact, *Johnson & Johnson v. GAC Int'l Inc.*, 862 F.2d 975, 979 (2d Cir.1988), entitled to deference under the clearly erroneous standard. Fed. R.Civ.P. 52(a); *see generally Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855–56, 102 S.Ct. 2182,.2189–90, 72 L.Ed.2d 606 (1982). The court's conclusion was not erroneous, let alone clearly so. As discussed in detail above, "rice-based" is a term of art used to describe oral electrolyte solutions made from rice grain powder, solutions which have proven superior to glucose-based solutions such as Pedialyte. The problem with Mead's rice claims is that Ricelyte does *not* contain powdered whole rice and is *not* a whole grain solution; consequently, Mead cannot truthfully characterize Ricelyte as a "rice-based" solution or claim that Ricelyte has the inherent health benefits thereof. Nor does Ricelyte contain rice carbohydrates (*i.e.*, amylose and amylopectin); it contains rice syrup solids, which are a completely different animal than, and yield few if any of the benefits of, non-hydrolyzed rice carbohydrates. Even WHO warned Mead that "the generally accepted meaning of 'rice-

based' cannot reasonably be applied to Ricelyte." Accordingly, we agree with the district court that Mead's rice claims falsely represent that Ricelyte has certain qualities that it in fact does not actually have, and hence are literally false in violation of § 43(a)(2). *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272 (2d Cir.1987) (record album cover falsely represents that enclosed record includes musical performances by Jimi Hendrix).

*The "Ricelyte" Name.* Mead also challenges the court's finding that Mead's use of the name "Ricelyte" is literally false because it expressly conveys the false message that the product contains rice. While Mead's brief on this point is somewhat murky, we perceive two, maybe three, lines of attack. The first implicitly concedes that the name "Ricelyte" delivers the express message that Ricelyte contains rice and rice carbohydrates, but contends that the message is true. As we just discussed, however, Ricelyte contains rice syrup solids, not rice or rice carbohydrates. Mead appears to have had some difficulty grasping this distinction, as most vividly illustrated by its comparison of Ricelyte to chicken soup:

> [Just as Ricelyte does not contain whole rice,] chicken soup does not contain whole chickens. No one can dispute that the feathers are important to the chicken, but no consumer is mislead, and no competitor has the temerity to argue that Campbell's should rename its soup because it only uses part of the chicken.

Def.'s Br. at 36 n. 14. This analogy misfires. Chicken soup is made from chicken meat and chicken fat, the business end of the chicken. Most consumers, we presume, expect that Campbell will not make its chicken soup with feathers. Mead, in contrast to Campbell, takes the business end of rice (*i.e.*, rice carbohydrates) and chemically breaks it down into rice syrup solids, which are not a "part" of rice or rice carbohydrates, but rather a completely different carbohydrate, both structurally and functionally. The expectations of consumers receiving the message that Ricelyte contains rice carbohydrates are not fulfilled. Mead's analogy might float if Campbell

chemically broke down chicken meat and fat into their constituent amino acids and fatty acids, dissolved the acids into a broth, and marketed the concoction as "chicken soup." Campbell does not do this, of course, because such a broth would not contain chicken and hence would bear virtually no relation to chicken soup. But that is just about what Mead does when it claims that Ricelyte contains rice or rice carbohydrates.

Mead's second line of attack shifts gears. It contends that the name "Ricelyte" does not relate a literally false message because the only literal, or express, message delivered is that Mead uses rice in manufacturing Ricelyte, which is true. The (allegedly) false message—that Ricelyte contains rice and rice carbohydrates—is not expressly conveyed, but only *implied*, by the "Ricelyte" name. Other circuits have recognized a difference between false literal statements and misleading or impliedly false statements under § 43(a)—a court may find on its own that a statement is literally false, but, absent a literal falsehood, may find that a statement is impliedly misleading only if presented with evidence of actual consumer deception, *Sandoz Pharmaceuticals*, 902 F.2d at 228–29; *Avis Rent A Car*, 782 F.2d at 386—and Abbott presents no reason to hold otherwise. Since Abbott offered no credible evidence demonstrating that the name "Ricelyte" actually misleads consumers or pediatricians into believing Ricelyte contains rice and rice carbohydrates, Mead continues, Abbott cannot prevail.

We reject this argument. First, the district court's preliminary finding that "Ricelyte" imparts the express message that Ricelyte contains rice and rice carbohydrates is a finding of fact, entitled to deference unless clearly erroneous. While reasonable minds might differ as to the nature (express or implied) of this message, we hesitate to conclude that the court's reading was clearly erroneous. Accordingly, Abbott need not present evidence of actual confusion to prevail on the merits. *PPX Enterprises*, 818 F.2d at 272.

■ Moreover, even were we to conclude that the court clearly erred in finding that "Ricelyte" expressly conveys the forbidden message, Abbott presented sufficient evidence at this stage to demonstrate that it impliedly conveys that message to consumers and physicians. Much of this evidence, in fact, comes from Mead's own files. For example, Mead, prior to entering the OES market, presented to a survey audience a variety of potential names before settling on "Ricelyte". Many of those who chose "Ricelyte" did so because they believed that any product with that name would contain rice. In addition, a scientist employed by Mead commented that the use of the word "rice" in the name "tells me it has rice in it." Abbott presented anecdotal accounts of physicians and consumers who were led to believe that Ricelyte contains rice carbohydrates and has the health benefits of rice-based solutions. The fact that Abbott did not conduct any full-blown consumer surveys to prove actual consumer confusion does not help Mead, for such proofs are not required at the preliminary injunction stage. *See Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 349 (7th Cir.1987); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 908 (7th Cir.1986).

The presence of this implied message is even more pronounced when viewed in the context of Mead's entire promotional campaign. That campaign, as noted, directs much, if not all, of its fire towards identifying Ricelyte as a rice-based solution and attributing to Ricelyte the health benefits of those solutions. The product's label places the name "Ricelyte" directly above the phrase "Rice–Based Oral Electrolyte Maintenance Solution." The references, both verbal and pictorial, to rice in Mead's print advertisements and brochures are extensive, to say the very least. The main message of Mead's promotional campaign is summed up in its 1990 Marketing Plan:

> Ricelyte's benefits ... are possible because it contains rice. If there is one thing we want doctors to remember, it is that this product is better because it contains rice.... Therefore, the positioning statement to be used with physi-

cians and nurses will be: "Ricelyte. Because Rice makes a difference."

In this context, the name "Ricelyte" implies more than the permissible message that Ricelyte is produced from rice or contains rice syrup solids derived from rice carbohydrates. It also implies that Ricelyte actually contains rice and rice carbohydrates—or at least we can say that Abbott has established a strong likelihood of so proving at trial. *Cf. Sandoz Pharmaceuticals*, 902 F.2d at 229–30.

This brings us to what we take to be Mead's third line of attack, which proceeds as follows: Because rice syrup solids, which are extracted from rice, are the principal non-water ingredients in Ricelyte, "[n]o other word in the English language more aptly describes the product than 'rice.'" Def.'s Br. at 35. This may be true in the abstract, but, again, the district court's preliminary finding that the name "Ricelyte" expressly imparts the false message that the product contains rice carbohydrates renders Mead's argument moot. In the event the court, on remand, determines that "Ricelyte" only implies that message, Mead might have a point—and we emphasize might—but only if it purges its promotional campaign of the false representations discussed above. Depending upon the ultimate course of proceedings on remand, the parties may find it profitable to address the issue of whether the "Ricelyte" name, in and of itself, impliedly conveys the same impermissible messages.

■ *The Comparison Claims.* The district court made two other significant findings: (1) Mead's statement that Ricelyte has a lower osmolality than Pedialyte, while literally true, is misleading because the difference in osmolality has no therapeutic significance; and (2) Mead's claim that Ricelyte is superior to Pedialyte in terms of fluid absorption and stool output does not have a firm scientific grounding, and hence is false. Mead takes issue with these findings, citing an array of evidence to refute them. While remaining neutral as to the merits, we believe that Abbott has established the requisite likelihood of proving its case at trial, particularly in light of

the deference we owe the meticulous and carefully reasoned findings entered by the district court. *See Inwood Laboratories,* 456 U.S. at 855–56, 102 S.Ct. at 2189–90. At argument the parties informed us that they soon anticipate the release of another study bearing upon the fluid absorption and water output issue; this study should help resolve whether Mead's claims are false or misleading. *See Sandoz Pharmaceuticals,* 902 F.2d at 227–28. Also, we expect that the parties will present evidence of consumer and physician reaction to the lower osmolality claim, for only if the claim, which is literally true, actually misleads does it violate the Lanham Act.

In sum, we agree with the district court's determination that Abbott has established a likelihood of succeeding on the merits of its § 43(a)(2) cause of action.

### B.

The second preliminary injunction threshold requires Abbott to establish that it will be irreparably harmed if it does not receive preliminary relief, and that money damages and/or an injunction ordered at final judgment would not rectify that harm. The district court determined that Abbott did not clear this threshold. In so holding, the court acknowledged the well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss. *See, e.g., International Kennel Club Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1091 (7th Cir.1988) (trademark infringement); *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982) (same); *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 276 (7th Cir.1976) (same); *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (false advertising); *cf.* Milton Handler, *Unfair Competition,* 21 Iowa L.Rev. 175, 193 (1936) ("The competition of a liar is always dangerous even though the exact injury may not be susceptible of precise proof.").

This presumption, it appears, is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations. *See Roland Mach.,* 749 F.2d at 386.

There can be no doubt that Mead's Ricelyte campaign, which attempts to convince consumers that Pedialyte is an inferior OES product, has dented Abbott's reputation. *See McNeilab,* 848 F.2d at 38 (comparative advertising "necessarily diminishes [the competing product's] value in the minds of the consumer").[4] The district court nonetheless found the presumption of irreparable harm rebutted owing to the unusual structure of the OES market. It reasoned as follows: Pedialyte enjoyed a virtual monopoly prior to Ricelyte's entry into the market. Any injunction, entered after a full trial, would remove Ricelyte from the market, thereby restoring Pedialyte's monopoly and lost market share. Under these circumstances, one could easily measure the sales Abbott lost while waiting for final judgment. As far as the future is concerned, Abbott's reputational damage will have no tangible economic impact because Pedialyte will have regained its monopoly, leaving those who need OES products with no other choice. It appears, then, that we are faced with a rare situation—any harm to Abbott's reputation and goodwill wreaked by Mead's promotional campaign between now and final judgment will be fully compensable in money damages, and therefore cannot be considered irreparable. Put another way, the fact that injunctive relief in Abbott's favor at final judgment would boot Ricelyte from the market renders compensable any injuries Abbott will have suffered in the interim.

The district court's conclusion rests upon two assumptions. First, the court assumed that if final judgment forced Mead to withdraw Ricelyte, Abbott's losses would be

---

4. In holding that Abbott did not demonstrate any injury to its reputation, the district court focused exclusively upon, and dismissed as "hyperbole," Abbott's assertion that Mead's cam-paign had shaken Abbott's "reputation for innovation." Dist.Op. at 76–77. The court did not address the reputational harm that attends a charge of product inferiority.

limited to past lost sales in the OES market. In our view, this assumption overlooks the fact that Mead's promotional campaign will probably have lingering, incalculable economic consequences even if final relief on the merits drives Ricelyte from the market. Any monopoly Abbott regains is unlikely to last very long. (We of course do not mean to imply that Abbott deserves a monopoly, or that a monopoly would benefit the OES market, but only that Abbott's damages would be difficult to calculate in the event it could not sustain a monopoly.) It is almost certain that Mead will re-enter, or some other company will enter, the OES market shortly after Ricelyte departs; the market has a proven potential for growth, see Dist.Op. at 80, and the dominant player has proven potentially vulnerable. Pedialyte's loss of goodwill will have tangible economic consequences once competition reemerges, because doubts planted by the Ricelyte campaign will linger in the minds of consumers and physicians, who may avail themselves of an alternative to Pedialyte if given the choice. Moreover, any shifts in the OES market between now and final judgment will affect the closely related competition between Abbott and Mead in the immense infant formula market, which accounts for more than $1.5 billion in annual sales. Mead acknowledged as much in its 1991 Marketing Plan, which opined that "[t]he more market share Ricelyte takes from Pedialyte, the more opportunities Ricelyte creates to" shift infant formula sales from Abbott to Mead. Any suggestion that forcing Ricelyte from the market after a full trial would completely reverse this shift is simply implausible.

The loss of market share Abbott will likely suffer in both the OES market (once competition reemerges) and the infant formula market was not considered by the district court. As an original matter, one could have concluded that Abbott would suffer these harms were preliminary relief denied, and that the difficulty, indeed practical impossibility, of quantifying them would render monetary relief inadequate, and hence Abbott's injuries irreparable. *American Hosp. Supply*, 780 F.2d at 597. It is more difficult, however, to determine whether the court's decision not to consider these harms constitutes an abuse of discretion.

We need not resolve that issue here, for the district court erred by assuming in the first instance that granting final injunctive relief to Abbott would necessarily mean the end of Ricelyte. Granted, some of the relief sought by Abbott—*e.g.*, an order requiring Mead to recall Ricelyte, change its label, and immediately cease use of the "Ricelyte" name—would eliminate Ricelyte from the market at least temporarily, and perhaps permanently. But other relief—*e.g.*, an order prohibiting Mead from purveying the false "rice claims" and directing it to issue corrective advertisements and brochures—would not have such drastic consequences. These less severe remedies would leave Ricelyte a viable, albeit somewhat discredited, competitor with at least part of its current market share.

The district court did not address the possibility of ordering these intermediate forms of relief after a full trial on the merits. *See* Dist.Op. at 78, 101–02; *see also id.* at 79 (enjoining use of current Ricelyte bottle and label), 102–03 (enjoining further use of the name "Ricelyte").[5] This, we believe, constitutes an error of law. It is axiomatic that injunctions, preliminary as well as permanent, have their basis in equity. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591–90, 88 L.Ed. 754 (1944). When faced with a motion for a preliminary injunction, a district court must remain flexible, and weigh the equities as to each element of preliminary relief sought by the plaintiff. *Lawson Prods.*, 782 F.2d at 1435–36. The same applies to final re-

5. Mead argues that the district court did not have to consider the effects of more mild remedies because "Abbott did not request any relief ... less draconian" than ordering Mead to recall Ricelyte, stop using the name "Ricelyte," or change its label. This is simply not true. Abbott explicitly requested the district court to enjoin Mead from advancing false claims in its promotional materials, Pl.'s Compl. at 21–22 (Feb. 21, 1991), relief certainly less draconian than that mentioned by Mead.

lief if, as here, the potential parameters of a permanent injunction will influence the equities that govern the propriety of issuing a preliminary injunction. The importance of flexibility is enhanced where those equities depend in great measure upon which preliminary and permanent remedies are ordered. *See id.* at 1435 ("[a]s the type of relief varies the parameters of the injunction equation will also change"). We therefore find that the district court abused its discretion by restricting its focus to those final remedies, to the exclusion of all others, that would eliminate Ricelyte from the market.

If on remand the district court should revisit the topic of preliminary relief, *see* pp. 31–32 *infra*, it should explicitly consider whether Abbott's injuries between now and final judgment would be irreparable if some intermediate form of relief were eventually ordered after a full trial. We take no formal stand on this issue, but offer the following observations. Any inquiry must start with the well-established, and in this case unchallenged, presumption that Lanham Act injuries are irreparable. *See International Kennel Club*, 846 F.2d at 1091; *McNeilab*, 848 F.2d at 38. While the district court found this presumption rebutted, we have concluded that an assumption underlying the court's rebuttal was erroneous as a matter of law. Absent any considerations we have not had occasion to address, we can see no reason why the presumption should not stand here. Less severe relief, as we just observed, would leave Ricelyte a viable competitor in the OES market, making it extremely difficult to measure Abbott's damages. Some consumers, particularly new parents, would choose Ricelyte for reasons unrelated to Mead's promotional campaign. Other consumers would inevitably choose Ricelyte on the basis of impressions formed during that campaign; this group includes, for example, consumers who accepted their physicians' initial recommendation to purchase Ricelyte but who were not subsequently informed that the recommendation rested upon false premises. In theory, one could differentiate between the two groups of consumers, and thus calculate the damages arising from Mead's campaign. In practice, however, it would "be very difficult to distinguish the effect of the [campaign] from the effect of other [factors causing consumers to purchase Ricelyte], and to project that effect into the distant future." *Roland Mach.*, 749 F.2d at 386. This difficulty would appear to render monetary relief inadequate, and hence Abbott's injury irreparable. *American Hosp. Supply*, 780 F.2d at 597.

Again, by offering these thoughts we do not intend to foreclose the possibility that Mead could rebut, in some other way, the presumption of irreparable harm. We certainly do not intend to suggest that the court must enter the forms of final relief, if any, that would render Abbott's interim injuries irreparable. Finding that, given certain assumptions regarding the potential scope of final relief, Abbott's injuries are irreparable only would mean that it has cleared the second preliminary injunction threshold; the wisdom of granting preliminary relief would then depend upon the discretionary weighing of all four preliminary injunction factors. *Id.* at 593. We conclude only that the district court's analysis of the second preliminary injunction threshold was erroneous as a matter of law.

### C.

We next consider the public interest. The district court concluded that granting Abbott's request for a preliminary injunction would disserve the public interest. Ricelyte, the court reasoned, is a safe and effective product whose presence in the market has promoted the public welfare by focusing attention upon OES products and increasing their use. The court also believed that forcing Ricelyte from the market would restore Abbott's former virtual monopoly, dousing competitive incentives to invest in additional research and develop more effective OES products.

We agree with the district court that forcing Ricelyte from the market would harm the public interest. It is a rare case where purging a safe and effective product serves broad societal interests. This is par-

ticularly so when the purged product is one of only two in a given market; monopolies, as a general rule, carry substantial social costs, including higher prices, lower output, and a reduced incentive to engage in product innovation beneficial to consumers. Phillip Areeda & Donald F. Turner, II *Antitrust Law* ¶ 403, at 271–72 (1978). The costs are even higher when, as here, important health concerns are involved. *See* p. 9 *supra.*

But we decline to accept the court's implicit assumption that granting Abbott preliminary relief would necessarily mean the demise of Ricelyte, for the same reasons we just rejected that assumption with regard to final injunctive relief. As noted, some forms of intermediate relief, such as ordering Mead to purge the false aspects of its promotional campaign and issue corrective advertising, would leave Ricelyte a viable competitor. In fact, such relief would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act. *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141 (S.D.N.Y.1990). The court therefore committed an error of law by not addressing less severe remedies that would have addressed the allegedly false and misleading aspects of Ricelyte's campaign without eliminating it from the market.

### D.

The district court also determined that the balance of hardships tilted in Mead's favor—in other words, that the irreparable harm to Mead of granting preliminary relief would outweigh the irreparable harm to Abbott of denying such relief.[6] It based this ruling upon a finding that the relief requested by Abbott, most notably an in-

junction prohibiting Mead's further use of the name Ricelyte, would drive Ricelyte from the market for some period of time, and hence might be "fatal" to the product's survival. This, the court stated, would work a "significant" irreparable harm to Mead, a harm which would far outweigh the "possible damage" to Abbott of denying preliminary relief. Dist.Op. at 78. We believe that the court's analysis contains two legal errors which led it to understate the harm to Abbott of denying an injunction and to overstate the harm to Mead of granting an injunction.

The first error we have already discussed: the court abused its discretion in concluding that Abbott would not suffer any irreparable harm if preliminary relief were denied. The second we have discussed as well. The district court's assessment that Mead would be significantly harmed by a preliminary injunction purging Ricelyte from the market rests on the supposition that any injunction entered would do just that. This supposition is unfounded, for imposing a less severe remedy would most likely wound, but not kill, Ricelyte. Consequently, the sting of a preliminary injunction would depend upon its scope, and could have been less injurious to Mead than the court surmised. *See* § III.C *supra.* These two errors of law, we believe, distorted the district court's assessment of the balance of irreparable harms.

Having found that the district court (1) overstated the irreparable harm to Mead and the public interest of granting a preliminary injunction, and (2) possibly overlooked the irreparable harm to Abbott of denying an injunction, we cannot accept its conclusion that the equities weigh in Mead's favor as to Abbott's false advertising claim under § 43(a)(2).

6. We emphasize that the relevant harms are only those that accrue between a court's ruling upon the preliminary injunction motion and the entry of final judgment, *Roland Mach.,* 749 F.2d at 391, and even then only those harms that could not be fully rectified by money damages or injunctive relief at final judgment or, as to the defendant, could not be fully covered by a Rule 65(c) injunction bond. *Id.* at 386, 387. Given its finding that Abbott failed to demonstrate any irreparable injury, the court techni-

cally did not have to balance the hardships; demonstrating irreparable injury is a threshold matter, the failure of which dooms a plaintiff's case and renders moot any further inquiry. *Lawson Prods.,* 782 F.2d at 1433. Nonetheless, a court under these circumstances is well advised to consider the irreparable harm that would attend a preliminary injunction, for it gives us something to work with if, as here, we rule that the plaintiff has cleared the irreparable harm threshold.

## IV.

The district court also denied Abbott's request under § 43(a)(1) of the Act to enter a preliminary injunction to halt Mead's alleged infringement of Pedialyte's trade dress. The court concluded that Pedialyte's trade dress is "functional," and therefore that Abbott had failed to establish that it was likely to prevail on the merits under § 43(a)(1), thus sinking its chances for preliminary relief at the outset. *Lawson Prods.*, 782 F.2d at 1433. We disagree with the court's conclusion, and therefore proceed to briefly examine the other three preliminary injunction factors.

## A.

"Trade dress" refers to a product's overall image, including its "size, shape, color, graphics, packaging, and label," *Vaughan Mfg.*, 814 F.2d at 348 n. 2, and receives protection against infringement under § 43(a)(1). *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986); J. Gilson, *Trademark Protection and Practice* § 2.13, at p. 2–178 (1991). Abbott contends that Ricelyte's overall packaging mimics Pedialyte's. Both products are marketed in translucent, square, quart-sized plastic bottles approximately eight inches high. (These bottles have traditionally been used by hospitals, nursing homes and other health care providers to contain sterile solutions, particularly irrigation solutions, and were adapted by Abbott and Mead for use in the OES market.) Both bottles have "ribs," or deep indentations, that run above and below the label, and the size and placement of the labels are virtually identical. Both the "Ricelyte" and "Pedialyte" trademarks run horizontally across the top of their respective labels, are slightly different shades of blue, have similar typefaces, similar lengths, and share the same "lyte" suffix.

 To prove trade dress infringement, Abbott must demonstrate that (1) Pedialyte's overall image is inherently distinctive or has acquired distinctiveness through secondary meaning, (2) consumers will likely be confused by the resemblance of Ricelyte to Pedialyte, and (3) Pedialyte's trade dress

is not "functional." *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. —, —, 112 S.Ct. 2753, 2756, 120 L.Ed.2d 615 (1992); *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182–83 (7th Cir.1989). The third element, functionality, is actually an affirmative defense as to which Mead bears the burden of proof. *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985). Here, the district court determined that Abbott had demonstrated the first two trade dress factors, but concluded that Mead had proven that Pedialyte's packaging was functional.

A particular trade dress is "functional" under § 43(a)(1) if "it is something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market." *Id.* at 346; *see also Inwood Laboratories*, 456 U.S. at 850 n. 10, 102 S.Ct. at 2187 n. 10 (dicta); *Schwinn Bicycle*, 870 F.2d at 1188, 1191; *Vaughan Mfg.*, 814 F.2d 349–50. Put another way, a feature is functional "if it is one that is costly to design around or do without, rather than one that is costly to have." *Schwinn Bicycle*, 870 F.2d at 1189. By "costly," we do not mean costly in some *de minimis* sense; nor do we mean fatally costly. Rather we mean costly in a way that will adversely affect a competitor's ability to produce and market a product of comparable price and quality. For example, a football's oval shape is functional because "it would be found in all or most brands of the product even if no producer had any desire to have his brand mistaken for that of another producer." *W.T. Rogers*, 778 F.2d at 339. In contrast, an automobile hood ornament in the shape of the Greek god Mercury is not functional because automobiles do not need such an ornament in order to function or compete effectively. *Id.* Most product features, of course, will fall somewhere in between these two extremes.

In examining Pedialyte's packaging, the district court found that the "clear, plastic, one-quart or one-liter bottle is functional in the OES market." Dist.Op. at 75–76. The court also found that the bottle's square shape "has functional aspects" because

square bottles are easier to handle, package and ship. *Id.* at 75. As such, it concluded that Pedialyte's overall trade dress is functional, and therefore that Abbott had not established a likelihood of succeeding on the merits of its § 43(a)(1) claim. We believe that the district court's conclusion constitutes an abuse of discretion because the court did not address all of the issues essential to a comprehensive examination of functionality. *Cf. United States v. Fordice,* —— U.S. ——, ——, 112 S.Ct. 2727, 2737, 120 L.Ed.2d 575 (1992) (remanding case because district court's analysis did not undertake the proper inquiries).

■ Abbott concedes that the Pedialyte bottle's size (one liter or quart), clarity and constituent material (plastic) are functional, but contends that its other features are not. Consider first the bottle's square shape. The district court found that squareness is functional in the OES market because square bottles have three benefits: they are "easier" to ship and package, take up "less space on a shelf than a comparable rectangular container," and are more "easi[ly]" handled by consumers. Dist.Op. at 75. We agree that square bottles have the first two benefits, and remain somewhat dubious as to the third. But even assuming that square bottles have all three benefits, our cases require something more to support a finding of functionality. Mead must not only point to certain advantages, but also demonstrate that depriving Ricelyte of these advantages will have a materially adverse impact upon its ability to compete effectively in the OES market. *Vaughan Mfg.,* 814 F.2d at 349–50; *W.T. Rogers,* 778 F.2d at 346. In other words, Mead must show that the cost of marketing Ricelyte in a non-square bottle will raise the cost of producing and marketing Ricelyte, and thereby drive its price above that of square-bottled OES products. *See Schwinn Bicycle,* 870 F.2d at 1191; *W.T. Rogers,* 778 F.2d at 342–43. Or, assuming no material price differential, it can show that consumers or retailers so prefer square bottles that no other shape will do.

*See Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1123 (7th Cir.1988).

■ The district court did not conduct these inquiries. It did not examine the extent to which the shipping and packaging advantages of square bottles impact the retail price of OES products; determine whether retailers would hesitate to display Ricelyte if it were packaged in, say, a cylindrical bottle; or consider whether consumers so prefer square bottles that they would eschew OES products packaged in cylindrical bottles. These are all open questions, and by raising them we do not mean to prejudge the merits or imply that Mead cannot demonstrate that square bottles are functional in the OES market. Our point, rather, is that determining that a particular feature is advantageous, or concluding that the feature makes it "easier" to do certain things, does not necessarily render it "functional" as the term is employed under § 43(a)(1). The district court erred as a matter of law by presuming otherwise.

■ The court also erred by leaving unaddressed the question of whether certain aspects of Pedialyte's label—such as its size and placement, and the placement, size and color of the "Pedialyte" trademark imprinted thereon—are functional. Labels, too, are part of a product's trade dress, *Blau Plumbing,* 781 F.2d at 608, and the court, in a different section of its opinion, found Ricelyte's and Pedialyte's labels to be markedly similar. Granted, there are some differences between the two; for example, Pedialyte's label has only two colors, while Ricelyte's is multicolored and adorned with a Beatrix Potter cartoon character. *See* Appendix. Nonetheless, any decision regarding the functionality of Pedialyte's trade dress must also take into account the many features the two labels have in common. *Vaughan Mfg.,* 814 F.2d at 350 (inquiry must consider a product's "overall trade dress").

In sum, the district court committed two errors of law in concluding that Abbott had not cleared the merits threshold of its trade dress claim.[7] However, given the posture

---

7. As an alternative argument for affirmance, Mead argues that Abbott has not established the

of this case—the district court is the principal factfinder and most familiar with the particulars of the underlying dispute—we cannot gauge how likely Abbott's success actually is. We therefore leave it to the experienced district judge to apply the proper legal standards to those particulars. In addition to the issues discussed above, the court, on remand, will likely confront Mead's contention that the only plastic, translucent one-liter bottles commercially available at the time it launched Ricelyte were square bottles manufactured by Baxter Laboratories, Inc. (Baxter). This fact, if indeed true, is relevant, but hardly dispositive of the functionality issue; its weight depends in part on whether Mead's limited options were the result of its own failure to timely develop or seek out reasonable alternatives. Also relevant are the costs Mead would incur, and the effect upon retail price, were it compelled to jettison the square Baxter bottle, either immediately or at some point in the future. *See Schwinn Bicycle,* 870 F.2d at 1191.

### B.

We proceed to the second threshold inquiry: whether Abbott has an adequate remedy at law and whether it will suffer an irreparable harm if it does not obtain preliminary relief on its trade dress claim. Our prior discussion of the irreparable harm issue, *see* § III.B *supra,* although made in the context of Abbott's false advertising claim, applies with equal, if not greater, force here. *See Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir.1983); *Processed Plastic,* 675 F.2d at 858. We observe (again) only that enjoining Mead's alleged infringement of Pedialyte's trade dress after a full trial would not necessarily force Ricelyte from the market. For example, the court could permit Mead to continue using Ricelyte's current packaging, but order it to print new labels and/or develop a non-square bottle as soon as com-

mercially feasible. *See Ideal Indus., Inc. v. Gardner–Bender, Inc.,* 612 F.2d 1018, 1026–27 (7th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Ideassociates, Inc. v. Ideatech, Inc.,* 704 F.Supp. 294, 295–96 (D.D.C.1989).

Our prior discussion of the public interest factor in § III.C, *supra,* also applies with equal force here, *see Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2763, as does our discussion of the balance of hardships in § III.D, *supra.* For the foregoing reasons, we cannot accept the district court's conclusion that Abbott was not entitled to preliminary relief on its § 43(a)(1) trade dress infringement claim.

\* \* \* \* \* \*

■ In cases such as this, we traditionally have done one of two things: reverse and direct the district court to order the preliminary relief we deem appropriate, or vacate and remand for renewed consideration under the proper legal standards. We decline to do the former because the district court, owing to its superior familiarity with the underlying facts of this case, is in a far better position than we to weigh the equities and fashion a proper remedy. We also decline to do the latter in the interests of expediency and judicial economy; the parties indicated at argument that they are virtually ready for a full trial on the merits and need only limited time for additional discovery. We therefore vacate the district court's denial of Abbott's request for a preliminary injunction, and remand with directions to commence a full trial on the merits within 60 days. If, contrary to our assumptions, there is no prospect for a trial within that time, we remand with directions to fashion appropriate preliminary relief, if any, in accordance with this opinion.

One final note. As we have emphasized throughout, the district court's analysis suffered from its near exclusive focus upon the most drastic remedies requested by Abbott (*e.g.,* product recall) to the exclusion of

---

second element of its trade dress claim: that consumers would likely be confused by the resemblance of Ricelyte to Pedialyte. This argument is without merit. The bottles, as the district court observed, are "virtually identical," *see*

Appendix, and Abbott need not present compelling evidence of actual consumer confusion at the preliminary injunction stage. *Vaughan Mfg.,* 814 F.2d at 349.

less severe remedies (*e.g.,* corrective advertising). This focus, we learned at argument, resulted from the district court's decision to adopt, nearly verbatim, the proposed findings of fact and conclusions of law submitted by the parties; obviously, the court selected some of Abbott's proposals and some of Mead's. Each party, it appears, tried to hit a home run, Abbott by submitting conclusions of law granting it all the relief it sought, and Mead by submitting conclusions of law granting Abbott nothing. Neither offered alternative conclusions that steered a reasonable middle ground. So, when it came time for the court to assess the impact upon the parties and the public of granting or denying preliminary relief, the court considered only the impact of either granting the most severe relief or shutting Abbott out altogether.

Of course there is nothing wrong and everything right with zealous advocacy. But counsel, when drafting proposed conclusions of law for the district court, should bear in mind a crucial observation to which we alluded above: courts retain a great deal of flexibility when fashioning preliminary relief, and the equities weighed under the four-part preliminary injunction standard can shift as the nature of that relief varies. *Lawson Prods.,* 782 F.2d at 1435–36; *see also Ideal Indus.,* 612 F.2d at 1026–27. Nor do we cast aspersions upon the widespread practice in the busy district courts of adopting many or most of the parties' proposed findings of fact and conclusions of law, particularly if skillfully and wisely drafted. Nonetheless, district judges also should bear in mind our observations regarding the nature of preliminary relief, and, when presented with proposed findings and conclusions that hug the extremes, consider developing alternatives of their own.

VACATED AND REMANDED, WITH DIRECTIONS.

APPENDIX