**PIZZAZZ PIZZA & RESTAURANT, et al., Plaintiffs,**

v.

**TACO BELL CORPORATION, and Pepsico, Inc., et al.; Defendants.**

No. C85–2543.

United States District Court, N.D. Ohio, E.D.

March 24, 1986.

John C. Spiccia, Anthony Mastroiani, Cleveland, Ohio, J. Ross Haffey, Bernard, Haffey & Bosco, Lyndhurst, Ohio, for plaintiffs.

Jack C. Berenzweig, Thomas M. O'Malley, Jeffrey A. Handelman, Willian Brinks Olds Hoffer Gilson & Lione, Chicago, Ill., Mark I. Wallach, Mitchell G. Blair, Calfee, Halter & Griswold, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Plaintiffs John J. Spiccia and Marie B. Spiccia, owners of Pizzazz Pizza and Restaurant, have moved for a preliminary injunction to prevent defendant Taco Bell from selling, marketing or advertising a product under the name "Pizzazz" in the State of Ohio; plaintiffs allege that defendants have infringed on their trademark and trade name in violation of the Ohio Uniform Deceptive Trade Practices Act, Ohio Revised Code § 4165.01 *et seq.* On September 23–24, 1985, the court conducted an evidentiary hearing on plaintiffs' motion for preliminary injunction. At the close of the evidentiary hearing on September 24, 1985, the court denied plaintiff's motion.

This memorandum opinion and order sets forth the court's reasoning, findings of fact and conclusions of law for its September 24, 1985 order denying injunctive relief.

## I. FINDINGS OF FACT

Plaintiffs founded Pizzazz Pizza and Restaurant on May 15, 1975 in Mayfield Village, Ohio. Since May 1975, plaintiffs have maintained their restaurant at a single location at SOM Center Road in Mayfield Village. The restaurant is a family-owned and operated business managed by plaintiffs and two of their sons. The restaurant serves Italian dishes, but its largest selling menu item is pizza. The restaurant can seat 50 persons at approximately 15 tables or booths. Food is served by waitresses and full liquor service is also available. The restaurant also offers carry-out food service for sandwiches and pizza.

Defendant Taco Bell is a wholly-owned subsidiary of Pepsico, Inc. It operates a chain of Mexican-style fast food restaurants. The Taco Bell chain consists of over 2000 restaurants nationwide (1035 company-owned stores, 975 franchises). Taco Bell's menu items, such as tacos and burritos, are packaged in paper bags, wrappers and cardboard boxes. Customers order at an indoor service counter or drive-thru window and pick up their orders; there is no waitress service. Limited seating is available.

Plaintiff John Spiccia, who had operated a storefront pizza shop seven months prior to May 1975, developed a pizza recipe which he believed was "a winner", "something extra" and "not the usual product." Tr. at 26, 48. Spiccia believes his product is unique because all the ingredients are fresh, Tr. at 26, the sauce contains specially measured spices to give it a "unique and exciting taste" and the entire operation is personally supervised by the Spiccia family members. Tr. at 48. Spiccia sought a name which "would describe the excellent food we were going to produce" and chose "Pizzazz Pizza." Tr. at 48.

Plaintiffs use "pizzazz" on a sign over the shop that says "Pizzazz Pizza and Restaurant, Take-out Shop" Tr. at 31, and in the names of menu items, including the restaurant's nine-inch, twelve-inch and sheet pizzas. Tr. at 35. A large pizza with several ingredients is listed as a "Deluxe with Pizzazz." In addition, the restaurant's house dressing is referred to as "Pizzazz house dressing." Plaintiffs package their carry-out pizzas in boxes bearing the logo "Pizzazz Pizza," although they sometimes use plain, unmarked boxes. Tr. at 35–36.

In July 1975 plaintiffs registered the trade name "Pizzazz Pizza" and "Pizzazz Restaurant" with the Ohio Secretary of State. Tr. at 53–54. They have renewed the trade names every five years as required by Ohio law. Tr. at 61. They made no federal or state trademark registration application.

In 1984, Taco Bell developed a new product, "Mexican style pizza." The product consists of a layer of ground beef and beans spread between two flat, flour tortilla shells; the upper shell is topped with cheese and pizza sauce. Taco Bell introduced the new product under the name "Mexican Pizza" in several test markets in 1984 and early 1985. Because of the product's success in test markets, Taco Bell decided to distribute its "Mexican Pizza" nationwide.

Taco Bell through its advertising agency conducted consumer research in February 1985 to test consumer reactions to "Mexican Pizza," and to develop appropriate advertising. They discovered that "Mexican Pizza" did not accurately describe the product and that the word "Mexican" with its suggestion of spiciness might deter potential consumers. Based on suggestions of consumers in focus groups, Taco Bell's advertising agency suggested changing the product name from "Mexican Pizza" to "Pizzazz Pizza." "Pizzazz" was chosen since it was believed to describe the qualities of the product, "zest, vim and liveliness," and because "pizzazz" was a play on the word "pizza."

Taco Bell conducted a trademark search for federal and state registrations of marks similar to "pizzazz" for pizza. Finding numerous other uses including a number of federal registrations and other restaurants using the name, Taco Bell concluded Pizzazz was a common name which did not

identify a particular source, and that numerous uses of the term coexisted in the marketplace. Taco Bell did not apply for a state or federal trademark registration.

Defendant's search revealed that the name "pizzazz" is used nationally by over 120 businesses, including restaurants, beauty shops, jewelry stores and gift shops. Over 30 restaurants in 18 different states use "pizzazz" or "pizazz," including "Pizzazz Pizza" in Syracuse, N.Y.; "Pizzaz Pizza" in Evansville, Indiana; "Pizzazz Pizza & Stuff" and "Pasta Pizzazz" in Oklahoma City, Oklahoma; "Pizza Pizzazz" in Boston; "Pizzazz Pizzeria" in Jeferson City, Missouri; and "Mineo's Pizzazz Restaurant" in Pittsburgh.

Defendant also found that in 1982 the Ohio Secretary of State authorized the EADS company in Columbus to use the trade name "pizzazz." Tr. at 62. Plaintiffs were not aware that any other company in Ohio had been given the trade name "pizzazz." Tr. at 45.62. The restaurant in Columbus is no longer in business. Tr. at 45.

Taco Bell introduced its new pizza product nationally under the name Pizzazz Pizza in June 1985. In the Cleveland, Ohio area a radio and TV advertising campaign for Taco Bell's "Pizzazz Pizza" began on July 8, 1985.

Early in July 1985, Maria Spiccia received a phone call asking if she and her husband had sold their "big secret pizza recipe to Taco Bell." Tr. at 28. Later in the month, plaintiffs saw television and newspaper advertising by Taco Bell for "Pizzazz Pizza." Tr. at 52. Plaintiffs spoke to their son John Spiccia, Jr., who is an attorney. Tr. at 53. He wrote a letter to Taco Bell at the end of July notifying Taco Bell that plaintiffs believed that Taco Bell was infringing on their registered tradename and that Taco Bell should stop any activities which would infringe on plaintiffs' name. Tr. at 19, 28.

The parties negotiated. On August 27, 1985, plaintiffs filed this action in the Cuyahoga County Court of Common Pleas. On the same date, the Court of Common Pleas issued an *ex parte* temporary restraining order prohibiting defendant from selling, marketing or advertising its product under the name "Pizzazz." The TRO contained no geographic limitations. Following a non-evidentiary hearing on August 30, 1985, the Common Pleas Court modified the temporary restraining order to restrict the injunction's geographical scope to the Cleveland metropolitan area. Between July 8, 1985 and August 26, 1985, Taco Bell spent approximately $240,000 to promote its "Pizzazz Pizza" in the Cleveland metropolitan area.

On September 4, 1985, defendants removed the action to this court pursuant to 28 U.S.C. § 1441. The parties agreed and the court ordered that the state court's TRO as modified would be extended through the close of this court's hearing on plaintiffs' motion for preliminary injunction.

## II.  CONCLUSIONS OF LAW

The burden of proof here is on the plaintiffs. *Day v. Video Connection of Solon, Ohio,* 602 F.Supp. 100, 103 (N.D.Ohio 1982). Plaintiffs must satisfy the four-part test stated by the Sixth Circuit Court of Appeals in *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977), which requires the court to consider:

1.  Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2.  Whether the plaintiff has shown irreparable injuries;

3.  Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4.  Whether the public interest would be served by a preliminary injunction.

These four factors "cannot be endowed with universally applicable weight. The determinate force accorded each element must proceed from the totality of the circumstances presented by the case under consideration." *Day,* 602 F.Supp. at 103. In infringement and unfair competition ac-

tions the first two factors are the most salient. Here, plaintiffs' showing of a strong probability of success on the merits turns on a showing that the marks in question are actually confusing or likely to be confused. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985); *Day*, 602 F.Supp. at 103.

While plaintiffs brought their claims under Ohio's unfair competition/deceptive trade practices statute, the analysis used to determine the likelihood of confusion is essentially identical to that used to evaluate infringement claims brought under federal trademark or unfair competition statutes. *Jewel Companies, Inc. v. Westhall Co.*, 413 F.Supp. 994, 999 (N.D.Ohio 1976), *aff'd* 575 F.2d 1176 (6th Cir.1978).

The Sixth Circuit has identified 8 factors to be considered in determining the likelihood of confusion between trademarks. As set out in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982), the 8 factors are:

(1) strength of the plaintiff's mark;

(2) relatedness of the goods;

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) likely degree of purchaser care;

(7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines.

Each of these factors will be considered separately below.

*(1) Strength of plaintiffs' mark.*

In evaluating the strength of plaintiffs' mark, it is useful to consider the four categories of marks. These range from (1) "generic" marks to (2) "descriptive" marks to (3) "suggestive" marks to (4) "arbitrary or fanciful marks". A "generic" term names a class of goods, for example "oats"; it cannot become a trademark. *See Miller Brewing Co. v. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A "descriptive" term identifies the qualities or characteristics of a product, and merits legal protection only if it has attained a secondary meaning—that is, a distinctive meaning acquired through substantially exclusive and continuous application to the product. *Miller Brewing*, 561 F.2d at 79; *Abercrombie*, 537 F.2d at 10. A "suggestive" term does not describe a product's qualities but requires consumers to use their imaginations to connect the term with the goods; it may be accorded protection without a showing of secondary meaning. *Id.* "Arbitrary" or "fanciful" terms are the strongest marks since they are naturally distinctive, having no logical or suggestive relationship to the goods with which they are used; they are protectible without a showing of secondary meaning. *Id.*

The plaintiffs' mark, "pizzazz," is a descriptive mark or term, used to identify plaintiff's product as having "something extra" and "being out-of-the-ordinary." A word's dictionary definition is an appropriate indicator of its ordinary significance and meaning to the public. *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir.1974); *Discount Muffler Shop v. Meineke Realty Corp.*, 535 F.Supp. 439, 445 (N.D.Ohio 1982). The Oxford English Dictionary, 3rd edition, defines "pizzazz" as "zesty, lively or zippy." Similar definitions appear in other dictionaries. Defendants also presented evidence of the word's widespread use in magazine and newspaper articles relating to pizza, food or restaurants, for example a *Time* magazine article from November 19, 1984 entitled "It's Pizza with Pizazz." The manner of selection of the term "pizzazz" by both plaintiffs and defendants, the use of the term as an adjective in periodicals, and its dictionary definition all lead to the conclusion that "pizzazz" is a descriptive term when applied to pizza. It does not distinguish the source or identity of the goods but merely describes their quality.

In order to establish a stronger mark and an entitlement to protection, plaintiffs must demonstrate that "pizzazz" has acquired a secondary meaning; in other words, plaintiffs must show that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Discount Muffler*, 535 F.Supp. at 447. Relevant factors in determining whether a term has acquired secondary meaning are: (1) the amount and manner of advertising; (2) the volume of sales; (3) length and manner of use; (4) direct consumer testimony and; (5) consumer surveys. *Id.* at 447.

Plaintiffs have failed to establish secondary meaning. They presented no evidence of consumer surveys or widespread consumer identification of the term "pizzazz" with their product. Plaintiffs do not conduct large-scale or consistent advertising; advertising for Pizzazz Pizza and Restaurant is limited to telephone directory listings and occasional print advertisements in local high school and church leaflets. Plaintiffs have not promoted their product by television or radio, and advertising expenditures for plaintiffs' restaurant have never exceeded $3,000 annually. In six of its last ten years, less than $1,000 was spent on advertising. In the last four years, plaintiffs have expended approximately $8,000 for advertising. Plaintiffs have relied chiefly on "word of mouth" promotion. While word of mouth advertising may be most effective in producing a loyal and satisfied consumer, the limited and inconsistent nature of such advertising is not sufficient to have created a secondary meaning for the term "pizzazz."

Plaintiffs produced several witnesses who testified that Taco Bell's television advertisements promoting "Pizzazz Pizza" confused them. Witnesses testified that they thought "Pizzazz Pizza had sold out to Taco Bell." Tr. at 88, 120–121. However, consumer confusion within a particular market "in and of itself, does not establish that one party's use of a name has given it secondary meaning." *Discount Muffler*, 535 F.Supp. at 447. Cross-examination of witnesses who expressed some confusion revealed that they did not actually believe that "Taco Bell was making the same pizza as Pizzazz Restaurant," Tr. at 116, or that they were unfamiliar with Taco Bell. *See, e.g.,* Tr. at 123. Thus, plaintiffs have not shown that "pizzazz" was imbued with a secondary meaning exclusive to their product.

Although plaintiffs registered their name in 1975 and have been using it for ten years, registration does not grant an exclusive right to use the name; registration does not enlarge one's right to a trademark, which is derived from its use in connection with particular goods. *Adams Baking Co. v. Interstate Bakeries Corp.*, 37 Ohio Misc. 79, 66 Ohio Op.2d 175, 307 NE 2d 273 (Ohio Com.Pl.1972). As earlier noted, the Secretary of State issued a trade name registration for "Pizza Pizzazz" to the Eads Corporation of Columbus, Ohio. Hence, the use of the mark for ten years in connection with plaintiffs' pizza, while significant, does not prove that the term has acquired a secondary meaning.

(2) *Relatedness of the goods.*

A description and examination of the goods themselves shows virtually no similarity in taste or appearance between the products. The plaintiffs' product is a traditional Italian-style pizza consisting of a bread-like dough spread with tomato sauce and covered with cheese and a variety of toppings. Defendant's product is a variation on a Mexican tostada, consisting of two tortilla shells topped with cheese and pizza sauce. Plaintiffs' product takes 15–20 minutes to prepare whereas defendant's "pizza" is a fast-food item. Full inspection of the products (not simply limited views through advertising photographs) shows an insufficient degree of similarity to cause actual confusion.

(3) *Similarity of the marks.*

This factor is the only one of the eight *Frisch's* factors which clearly weighs in plaintiffs' favor. The "pizzazz" marks are identical in spelling and sound and both are

applied to a pizza-like product. However, given the descriptive quality of the term and its presence in periodicals and dictionaries, this factor is not dispositive.

(4) *Evidence of actual confusion.*

As mentioned earlier, plaintiffs presented several witnesses who testified that defendant's commercials confused them. However, as indicated above, they were confused about whether plaintiffs had sold their business, not about the source or origin of the products.

Plaintiffs also called three employees of their restaurant. Tr. at 129, 135, 140. These witnesses, who are waitresses at Pizzazz Pizza and Restaurant, testified that customers came into the restaurant and presented coupons issued by Taco Bell which the customers believed could be applied as a discount toward the purchase of plaintiffs' Pizzazz Pizza, Tr. at 130–31. One waitress testified that customers mentioned to her that they had heard Taco Bell advertising on the radio and asked why "they [Taco Bell] were advertising our Pizzazz Pizza." Tr. at 136–137, 142–43.

Plaintiff's evidence, while suggestive of some consumer confusion, is entitled to little weight. First, the presentation of coupons alone does not suggest real confusion, since it is not unusual for individuals to present inappropriate coupons. Furthermore, the coupons clearly indicated their source, Taco Bell, and the waitresses immediately recognized this identification. Tr. at 132–33. Thus, the presentation of coupons shows only lack of care on the part of the consumers. As to inquiries about advertising, it is clear that customers were able to distinguish the source of the goods, since the typical inquiry was whether Pizzazz Pizza had sold itself to Taco Bell. Furthermore, no evidence was adduced that any patron ordered plaintiffs' pizza thinking it was the Taco Bell product Tr. at 138. Finally, the court must consider that the testimony offered was given by employees of the plaintiffs' restaurant. Although the court is aware of the real difficulty of obtaining evidence about consumer confusion, the testimony can be accorded only limited probative value.

(5) *Marketing channels used.*

The great differences between the types of marketing channels used by the parties also support a finding that there is little likelihood of confusion. As stated earlier, plaintiffs engage in limited advertising with no use of television, radio or general circulation periodicals. Their reliance on telephone directory listings and high school and church bulletins limits their promotion to a local area. Defendants engage in a national advertising campaign, spending large amounts on television and radio as well as newspapers, coupons and inserts. Defendants also use "point-of-purchase" advertising, including signs and displays in their stores, to promote particular menu items. Tr. at 180–81. While sheer size or volume does not conclusively indicate effectiveness, defendants' advertising expenditures of $240,000 for this one product in the Cleveland area in a two-month period exceed plaintiffs' total *annual* advertising expenditures by a factor of over 200.

In addition, the restaurant outlets themselves are clearly distinguishable. Plaintiffs operate a traditional restaurant where waitresses serve seated customers. Takeout service is available, but even then customers must order in advance or wait 15–20 minutes for their order to be prepared. The plaintiffs' restaurant itself is a white-frame house which suggests a unique, family-style establishment. Defendants, on the other hand, operate a nationwide chain of standardized fast-food establishments. Customers expect to place their order, be served within minutes, and be on their way. Defendants and their customers seek a uniformity of quality and service markedly different from that offered by plaintiffs' establishment. The differences in promotion and distribution render any actual confusion unlikely.

(6) *Likely degree of purchaser care.*

Defendants operate a fast-food establishment; purchasers are likely to be interest-

ed in making an impulse purchase to allay an immediate hunger. They are more likely to be attracted to their general knowledge of "Taco Bell" as a chain than to a particular product. Because "Pizzazz Pizza" is simply one product out of a number of menu items and always appears in connection with the source-indicator "Taco Bell," it is unlikely that customers would mistakenly think they could get plaintiffs' product in defendants' stores. Consumers of plaintiffs' product, however, realize that they must wait for an authentic, home-style Italian pizza. In other words, it is more likely that a purchaser will use a high degree of care and spend a great deal of time waiting for and searching out plaintiffs' product than defendant's, since they are more likely to enter defendant's stores for a taco than a pizza.

**(7) *Defendant's intent in selecting the mark.***

There is no evidence that defendant and its advertising agents selected the mark "Pizzazz" in other than good faith, or that defendant chose the mark hoping to capitalize on the goodwill and reputation created by plaintiffs. Defendant presented testimony that "pizzazz" was selected by its advertising agency after interviews with consumer "focus groups" in six test cities other than Cleveland. Tr. at 147–56. Defendant's advertising witnesses testified that they were not aware of plaintiffs' product at the time they recommended the name "pizzazz" to Taco Bell. Tr. at 156–57. Plaintiff suggests that defendant was negligent in conducting its trademark and tradename search and should have discovered plaintiffs' prior use and registration. While this court wonders why plaintiffs' product did not appear in defendant's search, defendant did exercise proper care and diligence. Although defendant did not find plaintiffs' particular registration, defendant found over 100 other uses of the term "pizzazz" in connection with restaurants or food. In the absence of any indication that defendant sought to "palm off" its product as plaintiffs', or that defendant negligently failed to place itself on notice

of other uses of the term "pizzazz," there are no grounds for finding that defendant intended to cause confusion by its choice of the mark. Moreover, defendant is under no duty to conduct a search before selecting a trademark. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 671 (7th Cir.1982).

**(8) *Likelihood of expansion of the product lines.***

Plaintiffs' witnesses provided only the most speculative testimony as to possible expansion of their product. At best these witnesses, who appeared to be friends of plaintiffs' family, expressed an interest in purchasing the restaurant. However, such discussions were general and never indicated a real intent on the part of the owners to expand. Tr. at 120, 126, 94–98. Negotiations had either been terminated, Tr. at 98, or never actually opened. Tr. at 126. Furthermore, even if plaintiffs did choose to open additional outlets, the scope of their expansion would be limited to the Cleveland metropolitan area. Similarly, whatever distinctive meaning is attached to the term "Pizzazz Pizza" in connection with plaintiffs' product is limited to the immediate Cleveland area so that defendant's introduction of its product in other stores is unlikely to cause confusion with plaintiffs' product.

In sum, 7 of the 8 *Frisch's* factors strongly favor a finding that there is little likelihood of confusion between plaintiffs' and defendant's products. Thus, plaintiffs have not shown a likelihood of success on the merits.

Plaintiffs have also failed to demonstrate irreparable injury, either in terms of lost sales or expansion opportunities. While it is possible that some customers may wonder about the business relationship between plaintiffs and defendant, plaintiffs can easily allay these concerns by the use of notices in signs and menus distinguishing their product from defendant's. On the other hand, the court must consider the great harm which a preliminary injunction

would wreak on defendant, which has already purchased $80,000 worth of advertising. In addition, defendant demonstrated that in the two weeks following the entry of the temporary restraining order, its sales dropped at least $30,000, Tr. at 222. The speculative harm to plaintiffs, when balanced against this injury to defendant, does not warrant the issuance of a preliminary injunction.

Finally, the public interest would not be served by issuing a preliminary injunction to prevent defendant from using the term "pizzazz" in connection with its product. Given the weakness of plaintiffs' mark and no indication that consumers are likely to confuse the products or their sources, it is in the public interest to allow the marketing of a new product, both nationally and in the Cleveland Metropolitan area. Furthermore, it would not promote the purposes of the federal trademark laws to allow plaintiffs to have an exclusive use of the term "pizzazz" in the absence of more diligent efforts on their part to protect the term and promote its identification with their product.

Plaintiffs have not made the requisite showings to justify the grant of a preliminary injunction. Accordingly, their motion for a preliminary injunction is denied.

IT IS SO ORDERED.