**RWT CORPORATION, Plaintiff,**

v.

**WONDERWARE CORPORATION, Defendant.**

**No. 95 C 7574.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 3, 1996.

Charles A. Laff, John T. Gabrielides, Laff, Whitesel, Conte & Saret, Paul L. Zulkie, Goldberg, Zulkie & Frankenstein, Ltd., Chicago, IL, for RWT Corporation.

Marion B. Adler, Hedlund, Hanley & John, Chicago, IL, Stephen P. Swinton, Cooley, Godward, Castro, Huddleson & Tatum, San Diego, CA, for Wonderware Corporation.

## MEMORANDUM OPINION

BUCKLO, District Judge.

This case presents a trademark dispute involving the competing marks ONTRACK and INTRACK. Each term is a trademark for computer software for "manufacturing execution systems," called "MES." RWT Corporation, the owner of the ONTRACK mark, which is federally registered, No. 1,764,091, sued Wonderware Corporation, the owner of INTRACK, in December of 1995. RWT seeks a preliminary injunction barring Wonderware from further use of the IN-TRACK mark pending the conclusion of this suit. The parties conducted expedited discovery and I held an evidentiary hearing on the motion. For the reasons stated in this opinion, RWT's motion is denied.

RWT is an Illinois corporation located in Mt. Prospect, Illinois. RWT designs, produces, and sells MES software. RWT began using the ONTRACK mark on its MES software in 1990. ONTRACK software is designed for use in manufacturing plants. It tracks or monitors products through each step of the manufacturing process, monitoring the steps in that process, which allows a company to know what is happening on the factory floor at any time. It will report on such things as schedules, resource status, work-in-process status, the amount of scrap and non-conforming product, historical trends, and productivity. MES software can identify a particular part used in a particular product, raw materials used, and which manufacturer provided the materials. ON-TRACK software is run on personal computers.

RWT's principal product is ONTRACK software, constituting, along with maintenance of the product, 70 percent of RWT's revenue. During the past year, RWT spent in excess of $90,000 advertising or promoting ONTRACK through direct mailers, brochures, trade shows, and print media advertisements in North America and Europe. RWT prominently displays its ONTRACK mark.

RWT obtained federal trademark registration for ONTRACK on April 13, 1993, for computer software.

Wonderware is a Delaware corporation with headquarters in Irvine, California. It is a public corporation with annual sales exceeding $35 million. Until 1995, although Wonderware sold computer software, it did not compete with RWT. Sometime in 1994, Wonderware began negotiations with another company, EnaTec, which owned a software

called Chinook, which competed with ON-TRACK, although the sale was not finally announced until June, 1995.

Wonderware's first public announcement that it would market a software, which combined the Chinook and Wonderware's own InTouch software and would be called IN-TOUCH, was at a large trade show at McCormick Place in Chicago, in March, 1995. It is unclear how much of an announcement took place at the show. The show is a huge exhibition, and Wonderware's exhibit was large and covered several, perhaps all, of its products. When the exhibit arrived in Chicago, it did not include any sign identifying any product as INTRACK. Sometime during the show, or perhaps before it opened, a sign was put up, identifying one display as INTRACK. Furthermore, in the months after the show, Wonderware sent letters, one of which went to RWT's president, Bernard Asher, in which it described several products, including INTRACK, which it said was "due out this spring." For a couple of months, it also ran an advertisement in trade journals describing INTRACK software. On June 29, 1995, Wonderware announced that it had purchased the remaining 80 percent ownership of EnaTec and that it had combined the EnaTec software with its own "in our soon-to-be-announced InTrack MES product."

Wonderware made its first sale of IN-TRACK software in November, 1995.

### Issuance of a Preliminary Injunction

■ A party seeking a preliminary injunction must first demonstrate that (1) it has some likelihood of succeeding on the merits and (2) it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir.1992). If the party establishes both these criteria, the court then considers (3) the balance of harm to each party of denying or granting the injunction and (4) the public interest. *Id.* at 11–12. The court then balances all four factors, using a "sliding scale" approach. *Id.* at 12. "Even if [the plaintiff] ha[s] only a modest chance of prevailing on

the merits, it would be entitled to a preliminary injunction if it could show that the denial of the injunction would inflict severe irreparable harm on the plaintiffs." *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993).

### Trademark Validity

■ Wonderware argues that RWT's ON-TRACK registration should be declared invalid on the ground that ONTRACK is descriptive.[1] Wonderware relies on statements in RWT's promotional materials that say "Get your factory OnTrack;" "By dispatching and tracking your order," the customer can tell how it is doing; and "Get OnTrack." RWT says the statements carry a double meaning, intending to convey the idea that the customer should buy the ONTRACK software. RWT also notes that of 25 MES systems listed in Defendant's Exhibit 13, ONTRACK is the only one that uses the word "track" in its name.

Wonderware's evidence indicates there may be another company out there that also calls itself an MES manufacturer that also markets software called ONTRAC. Wonderware points to various evidence that the word "track" is part of the name of other MES or similar products. RWT, of course, claims protection for ONTRACK, not "track."

The Seventh Circuit holds that in most cases whether a trademark is suggestive or descriptive is a question of fact. *E.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 953 (7th Cir.1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). In *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 609 (7th Cir.1986), Judge Posner referred readers to Judge Friendly's discussion in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir.1976), on the difference between descriptive and suggestive marks. Judge Friendly noted that the category of suggestive marks was created to provide protection to marks that were not really fanciful but also not "exactly descriptive." Id. at 10. But as Judge Friendly noted, quoting from

---

**1.** Although one of its experts actually testified that ONTRACK was a generic name for software,

I do not understand Wonderware to take this position.

Judge Learned Hand, it is difficult (Judge Hand said "impossible") to divine a rule from the cases that is helpful in placing a particular trademark in one category or the other.

Various tests have been suggested for making such a determination. Judge Friendly discussed the "imagination" test (stating that "a term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods," *Abercrombie & Fitch Co.*, 537 F.2d at 11), and while the Seventh Circuit appears to concur, it has also said that by imagination it means the "mental process required to connect a name that is incongruous or figurative with the product." *Quaker Oats Co.*, 978 F.2d at 953. It has added that even if imagination were required to link a purported mark with its product, it could still be descriptive if the mark described a characteristic of the product. *Id.*

Each party to the present case argues that under this test, or others suggested by them, that ONTRACK is descriptive or suggestive. I do not think, at least as a matter of law, that ONTRACK is incongruous as a name for MES software designed to help a manufacturer keep "track" of its manufacturing process. On the other hand, if someone were simply told that this product is software with the name ONTRACK, I do not think that without some thought, including imagination, most people would assume this product is software "meant to automate production control and process management," as described in one of Wonderware's exhibits.[2]

The difficulty in deciding whether a mark such as ONTRACK is more likely to be found suggestive or descriptive is not aided by a review of reported decisions. Marks found suggestive include "Business Week" (*see Blau Plumbing*, 781 F.2d at 609); "Stronghold" as a mark for nails (*Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc.*, 205 F.2d 921 (7th Cir. 1953)); "Dial–A–Mattress" as a mark for the telephone order and delivery of mattresses (*Dial–A–Mattress Operating Corp. v. Mat-*

*tress Madness*, 841 F.Supp. 1339 (E.D.N.Y. 1994)); "Heartwise" for foods for the heart (*Worthington Foods, Inc., v. Kellogg Co.*, 732 F.Supp. 1417 (S.D.Ohio 1990)); "Laser Printer Management System" as a mark for the servicing of laser printers (*Laser Services v. Deenin*, 29 U.S.P.Q.2d 1064, 1993 WL 165666 (D.Ore.1993)); "Phone Forward" as a mark for telephone call diverting equipment (*Bell-South Corp. v. Plaum Technology Corp.*, 14 U.S.P.Q.2d 1555 (T.T.A.B.1988)); "Load–Carrier" as a mark for vehicle load support (*Maremont Corp. v. Air Lift Co.*, 463 F.2d 1114 (C.C.P.A.1972)); and "Savings Shop" as a mark for savings and loan services (*Decatur Fed. Sav. & Loan Ass'n v. Peach State Fed. Sav. & Loan Ass'n*, 203 U.S.P.Q. 406, 1978 WL 21348 (N.D.Ga.1978)), to name a few. Marks found descriptive, on the other hand, include "pizzazz" for pizza (*Pizzazz Pizza & Restaurant v. Taco Bell Corp.*, 642 F.Supp. 88 (N.D.Ohio 1986)); "Telemed" for a service of analyzing electrocardiograms by telephone (*Telemed Corp. v. Tel–Med, Inc.* 588 F.2d 213 (7th Cir.1978)); and "Auto Page" as a mark for an automatic dialing device (*Gimix, Inc. v. JS & A Group, Inc.* 699 F.2d 901 (7th Cir.1983)). While some of these holdings can be sensibly distinguished from one another, others cannot.

 I conclude that there is some likelihood that a finder of fact may find ONTRACK as a name for MES software to be suggestive. ONTRACK describes, in part, what use of the software is intended to enable a purchaser to do. It does not describe the software, however. Furthermore, various advertisements for other MES software put in evidence show that neither "track" nor "ontrack" is necessary to describe how MES software works or its purpose. Indeed, in my review of numerous advertisements and articles from a magazine supplement submitted in evidence by Wonderware, I noticed the word "track" used only once.[3] But under Seventh Circuit case law, there is also some possibility that it could be found descriptive. It is not a necessary word to describe what

---

**2.** DX 134, Bates No. CR04999.

**3.** The articles and advertisements describe MES in terms such as "instant access," a way to "bridge information gap between process control and business systems," "visibility to spot ...

problems," "information is instantly assembled and analyzed," MES is "a species of plant-floor computer systems meant to automate production control and process management," "managing inventory," "scheduling work and giving realistic delivery dates." DX 134.

the software does, but it is an apt term. It is not a "strong" mark, in trademark terms.[4]

■ RWT says even if its mark were to be found descriptive, it has established secondary meaning. Descriptive marks may have trademark protection if they have acquired secondary meaning, that is, " 'an association in the mind of the consumer between the trade dress [or name] of a product and a particular producer.' " *International Kennel Club of Chicago v. Mighty Star, Inc.,* 846 F.2d 1079, 1085 (7th Cir.1988) (quoting *Vaughan Manufacturing Co. v. Brikam International, Inc.,* 814 F.2d 346, 348 (7th Cir. 1987)) (alteration in original). RWT's evidence to support this finding is, however, weak. Until this litigation arose, it had done very little print advertising, and had principally promoted its product at trade shows. While RWT evidently has been successful, there was simply very little evidence to indicate that any consumer, even limited to those in the market for MES products, identifies ONTRACK with a particular source. Indeed, two of RWT's own salesmen, who had worked in the sale of manufacturing and engineering software (although not the sale of MES software), admitted that they had not heard of ONTRACK until shortly before they went to work for RWT. I conclude that there is little chance that RWT will be able to prove that ONTRACK has strong secondary meaning.

### Likelihood of Confusion

There was no testimony showing actual confusion between the two products, although there was some testimony that indicated people may mistake "on" for "in" or vice versa. In particular, an RWT salesman testified that he had attended a slide presentation at a customer's business put on by an RWT joint venture partner, in which RWT's partner inadvertently displayed the IN-TRACK name rather than ONTRACK.

■ The test for trademark infringement is not actual confusion, which is often impossible to prove, but likelihood of confusion. *See* 15 U.S.C. § 1114(1)(a) (creating liability where use of mark "is likely to cause confusion"). *See also Reed–Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 911–912 (7th Cir.1996) ("The principle issue in a [trademark infringement case] is whether consumers are likely to be confused about the identity or source of the products in the marketplace."); *International Kennel Club,* 846 F.2d at 1090 (stating that "likelihood of confusion 'can be proven without any evidence of actual confusion . . .' ") (quoted case omitted). The Seventh Circuit advocates a seven factor test to evaluate the likelihood of confusion. *Smith Fiberglass Products, Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir. 1993). These factors are the similarity of the marks, similarity of the products, area and manner of concurrent use, degree of care likely to be exercised by consumers, strength of the plaintiff's mark, actual confusion, and intent of the defendant to "palm-off" its product as the plaintiff's. *Id.* Wonderware relies on testimony that both companies' customers are sophisticated, that sales of the products are for large sums of money, as well as testimony from its experts that people in general supposedly easily distinguish between "in" and "on" in support of its contention that there is no likelihood of confusion.

Testimony did establish that RWT and Wonderware both seek customers who are among the largest companies in the United States, and that sales to these customers may run from several thousand dollars to, potentially, hundreds of thousands of dollars in software and computers. In deciding which software to purchase, the potential customer often uses a team approach, which may include managers and people from various disciplines. Sales follow investigations of various software, which may last several months.

Two experts testified on behalf of Wonderware. One, Professor Richard Lutz, a professor of marketing at the University of

---

4. The parties do not dispute that RWT's federal registration has not become uncontestable. RWT argued that there was nevertheless a strong presumption in favor of validity that Wonderware would have to overcome due to the fact of RWT's federal registration. But the Seventh Circuit has held that this presumption merely shifts the burden of production of evidence to a defendant and that it "evaporates" when a defendant presents evidence to support invalidity. *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 83 F.3d 169, 172 (7th Cir.1996). Since Wonderware has presented such evidence, RWT cannot rely on the presumption in this case.

Florida, testified that with a complex purchasing process in which various software is examined carefully, there is almost no likelihood of confusion. Professor Lutz agreed, however, that at an early stage a prospective purchaser might see ONTRACK or INTRACK, and mistakenly end up considering the wrong product. He also admitted that if a prospective customer saw INTRACK and did not like it, he might never consider ONTRACK due to confusion as to source. He also admitted that a customer might think one company was associated with the other. In making his analysis, Professor Lutz did not interview any end users.

Professor David Yerkes, a professor of English at Columbia University, also testified on behalf of Wonderware. Professor Yerkes testified that people pronounce "in" and "on" with different parts of their mouths, and for that reason and the fact that their meanings are not the same they are unlikely to confuse INTRACK and ONTRACK. He also thought ONTRACK was a generic term for software. Professor Yerkes does not have marketing training or experience. Professor Yerkes also has no training in trademark law, and thought that neither "uptowner" nor "downtowner," or "Blue Nun" nor "Blue Angel," would be likely to be confused with its similar name. (Each term has been found to result in a likelihood of confusion when used on competing products, as discussed below.)

I did not find Professor Yerkes' testimony convincing. Although he may have correctly stated that INTRACK and ONTRACK are linguistically different, his opinion that consumers are unlikely to confuse them is not based on an understanding of the factors courts consider in determining likelihood of confusion. For example, he stated that he believed that consumers were not likely to confuse "uptowner" and "downtowner." In *The Downtowner Corp. v. Uptowner Inns, Inc.*, 178 U.S.P.Q. 105 (T.T.A.B.1973), the Patent Office Trademark Trial and Appeal Board found the terms "downtowner" and "uptowner" were likely to confuse consumers and refused the defendant the right to regis-

ter its mark. The Board recognized that the words had different meanings, but found that the words were "associative terms." [5] Moreover, the Board noted that the terms were not "in common usage as a portion of a business name." *Id.* at 109. For these reasons, the Board, held that consumers were likely to "mistakenly assume that [both "downtowner" and "uptowner" hotel] are all part of the same chain or, are in some way, affiliated therewith." Professor Yerkes', however, indicated that he would not find a likelihood of confusion for the terms.

Similarly, in *H. Sichel Sohne, GmbH v. Michel Monzain Selected Wines, Inc.*, 202 U.S.P.Q. 62 (T.T.A.B.1979), the Board refused to allow the mark "Blue Angel" to be registered after the holders of the mark "Blue Nun" opposed it. The applicant argued that confusion was unlikely because the terms were different in sound, appearance, and connotation, but the Board rejected this argument, stating that "the fact that the marks have aural and optical dissimilarity is not necessarily controlling on the issue of likelihood of confusion in the marketplace where the marks convey the same general idea or stimulate the same mental reaction." *Id.* at 65.[6] Again, Professor Yerkes testified that, under his analysis, the terms would not confuse consumers. I am therefore not persuaded by his testimony.

I find that there is some basis for concluding that RWT may be able to show that the similarity between ONTRACK and INTRACK is likely to confuse persons unfamiliar with the two products. Nevertheless, on this record that evidence is largely conjecture since it is almost exclusively based on the fact that persons have, and are likely easily to mix up or pay little attention to, the "i" or "o" that distinguish "in" and "on" when the words are not used in the normal context of English language. Furthermore, the evidence indicates that actual buyers of MES software generally become familiar with available products. Thus, the principal danger, perhaps the only danger, that a buyer may mistakenly explore, buy or reject ON-

---

5. I note that "downtowner" and "uptowner" are pronounced as differently (or more so) than INTRACK and ONTRACK, and like "downtowner" and "uptowner," INTRACK and ONTRACK are "associative terms."

6. I note that ONTRACK and INTRACK certainly "convey the same general idea" and create "the same mental reaction."

TRACK because of confusion with IN-TRACK is at the initial stage, when deciding which products to investigate further.

If buyers of ONTRACK or INTRACK are in fact confused by the products, RWT would be in substantial danger of becoming the victim of reverse confusion.

> Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured because "[t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."

*Quaker Oats Co.*, 978 F.2d 947 at 957 (quoted case omitted). Here, Wonderware is a much larger company than RWT and could quickly saturate the MES market with INTRACK. Thereafter, consumers seeing RWT's ON-TRACK software may mistakenly identify it with Wonderware rather than RWT, causing RWT to lose its corporate identity. The Seventh Circuit recognizes reverse confusion as "a redressable injury under the Lanham Act." *Id.* at 958.

### Laches

 Wonderware argues that RWT's motion for a preliminary injunction is barred by laches. Wonderware says the evidence shows conclusively that RWT executives knew at least by February, and certainly April, 1995, that it intended to sell competing software with the trademark INTRACK, but did nothing until it filed this suit in December, 1995, after, says Wonderware, it had expended substantial sums in developing, advertising and promoting the new trademark.

The evidence is inconclusive as to whether RWT learned of the INTRACK name at the March, 1995 show in Chicago. Photographs introduced in evidence do show that the name was displayed prominently during that show, but evidence also showed that the original exhibit did not include the name.

RWT executives testified that they did visit the exhibit, but did not see the name. Wonderware executives testified that the replacement name was put on the exhibit before the exhibit opened. Wonderware and RWT executives also disputed a conversation between the two with regard to the name at the show. I need not resolve the credibility issue because Mr. Asher, RWT's president, admits receiving the letter Wonderware sent to all persons who submitted business cards at the exhibit in April, 1995. That letter, described previously, states that Wonderware has a new product known as IN-TRACK. Mr. Asher testified that it is common in the industry to announce a new product that never reaches market and that, without more, he assumed this product might be "vaporware" (a nonexistent product). He testified that he did call the telephone number listed but never received a return call.

He did see, or should have seen, an advertisement in trade magazines that he subscribed to, and says he generally browsed through, during the next month or so. At any rate, Mr. Asher saw the press announcement made at the end of June announcing the merger of EnaTec and Wonderware and the forthcoming INTRACK software. At that time, he called someone at Wonderware. Mr. Asher's telephone call was returned in September, 1995.

On October 12, 1995, RWT's attorneys sent Wonderware a letter stating that Wonderware's use of the mark INTRACK violated RWT's trademark rights in the name ON-TRACK, and demanding that Wonderware stop using the mark. On October 24, 1995, Wonderware's attorneys wrote back, acknowledging receipt of the letter from RWT counsel, and stating that they were making an evaluation and would respond when their analysis was complete. RWT did not hear any more from Wonderware, however, and on November 29, 1995 wrote Wonderware's attorneys stating that unless RWT heard from them by December 4, they would take appropriate action to protect RWT's interests. This letter provoked a response, dated November 30, 1995, in which Wonderware's counsel stated that they were "still reviewing the issue" and that they would respond substantively within several weeks. On Decem-

ber 22, 1995, having heard nothing further from Wonderware, RWT filed this suit. Its motion for a preliminary injunction, filed a month later, was precipitated by its immediate concern that a large trade show would be held at McCormick Place in Chicago, this time with Wonderware's large display situated across the aisle from RWT's much smaller display of its ONTRACK software.

Wonderware argues that RWT's delay in bringing suit prejudiced it because it went to great expense during that time to promote its new name. Wonderware also says it would be very costly to change its name at this point because it would have to change the software itself and undertake a new promotion campaign. I found much of Wonderware's testimony in this regard not to be credible. In terms of future costs, it is about to update the software anyway. A lot of the expenses on which Wonderware relies are for things like boxes, which also are to be replaced soon. Wonderware admitted that it could replace everything within two months.[7] In addition, at the time of the hearing it actually had only one end user running the INTRACK software.

Wonderware would, presumably, have to undertake a new promotional campaign if it had a new name. But Wonderware is not an innocent victim of any delay by RWT. Wonderware certainly knew of the ONTRACK name and software at least by the March, 1995 trade show in Chicago, where RWT displayed its product. What's more, Wonderware at about that time did a trademark search, which turned up the RWT registration. Wonderware did not seek an opinion of counsel at the time regarding infringement.[8]

### Irreparable Harm

■ To obtain a preliminary injunction, RWT must show that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. *Abbott Laboratories*, 971 F.2d at 11. Irrepa-

rable harm is usually presumed in trademark infringement cases. *Id.* at 16 (explaining the "well-established presumption that injuries arising from Lanham Act violations are irreparable"); *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1332 (7th Cir.1977) ("[T]he damage to the goodwill and prominence of the [plaintiff's] trademark through public confusion of it with the [defendant's] trademark is, in itself, an irreparable injury."), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). Here, RWT has shown that it may suffer damaged goodwill if Wonderware infringes its trademark. The software products are similar and compete in the same market. Money cannot compensate RWT for this harm. *See, e.g., Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

### Balance of Harms

■ Because I have decided that RWT has shown at least some likelihood of success on the merits and that it will suffer irreparable harm if the injunction is not issued, I must balance those factors against the harm to Wonderware and the harm to non-parties if the injunction is issued. *Abbott Labs*, 971 F.2d at 12. I must weigh all four factors, attempting to " 'minimize the costs of being mistaken.' " *Id.* (quoting *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)). In doing so, the Seventh Circuit mandates a "sliding scale" approach—one "properly characterized as subjective and intuitive, one which permits district courts to 'weigh the competing considerations and mold appropriate relief.' " *Abbott Labs*, 971 F.2d at 12 (quoted case omitted).

The Seventh Circuit has also said that the " '*granting of a preliminary injunction is an*

---

7. There was testimony that after changing "source codes" to reflect a new name Wonderware would have to undertake a new period of quality assurance. I did not find Wonderware's witness credible. Apart from his demeanor, I note that his testimony with regard to his knowledge of the difficulty of changing "source codes" was inconsistent with other statements made by

him, indicating rather less knowledge of computer software.

8. This omission is particularly notable because Wonderware had already had a trademark dispute over its name INTOUCH. It settled that dispute with an agreement to discontinue using the name over a period of time.

exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it', presumably because it constrains one of the party's freedom to engage in ... non-criminal behavior." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1181 (7th Cir.1989) (quoting *Roland Machinery Co. v. Dresser Ind., Inc.*, 749 F.2d 380, 389 (7th Cir.1984)) (emphasis in original). In this case I have said that I did not think the cost to Wonderware from an injunction would be as great as it attempted to show. Nevertheless, the reality of an injunction in this type of case is that it effectively ends the dispute in most cases because even if the injunction is eventually lifted it is generally not cost productive to go back and attempt to reclaim the enjoined mark. On RWT's side, if there is confusion in the marketplace over these names one party, and since RWT is the smaller company by far it seems more likely to be injured, may well be harmed by lost business. As the trademark owner, of course, every day that Wonderware uses a trademark that is confusingly similar, if it is, harms its ability to protect that mark in the future as well.

The balance of harms therefore comes down to the strength of RWT's trademark and its showing of likelihood of confusion. On these issues, I think under the law of this circuit RWT has shown that it has some but not a better than even chance of prevailing on its claim that it has a valid trademark. Neither is the evidence of likelihood of confusion strong on the present record. I conclude that a preliminary injunction should not issue. If RWT chooses, I will attempt to schedule a trial during the next few months. If it prevails at trial, it will be entitled to an injunction.