**WISCONSIN COALITION FOR ADVOCACY, INC.,**
Plaintiff,

v.

**Kay CZAPLEWSKI, Acting Administrator, The Shores Health and Rehabilitation Center, AMS Green Tree, Inc., and AMS Properties, Inc., jointly doing business as Mariner Post–Acute Network.**

No. 00–C–1363.

United States District Court,
E.D. Wisconsin.

Jan. 16, 2001.

Michael J. Bachhuber, Wisconsin Coalition for Advocacy, Milwaukee, WI, for Plaintiff.

Maureen A. Molony, Daniel M. Lowndes, Cook & Franke, Madison, WI, for Defendants.

## DECISION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION TO DISMISS

CALLAHAN, United States Magistrate Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on October 23, 2000, when the plaintiff, Wisconsin Coalition For Advocacy, Inc. ("WCA"), filed a complaint naming as defendants Kay Czaplewski ("Czaplewski"), AMS Green Tree, Inc. and AMS Properties, Inc., jointly doing business as Mariner Post–Acute Network. Accompanying the plaintiff's complaint was a motion for preliminary injunction, together with supporting affidavits and a memorandum of law. After having been served with a copy of the summons, complaint and motion for preliminary injunction, the defendants filed a motion to dismiss the plaintiff's complaint claiming that this court does not have jurisdiction to hear this action and that the plaintiff's complaint fails to state a claim upon which relief can be granted. The defendants also filed a brief in opposition to the motion for preliminary injunction. On January 9, 2001, the court entertained oral argument on the motions, which have now been fully briefed and are ready for resolution. For the reasons which follow, the defendants' motion to dismiss is denied and the plaintiff's motion for preliminary injunction is granted, in part.

According to the factual allegations of the plaintiff's complaint, which, at least for purposes of the defendants' motion to dismiss, the court must assume are true, WCA is a non-stock corporation that has been designated by the State of Wisconsin to protect and advocate on behalf of people with disabilities pursuant to federal law, including the Development Disabilities Assistance and Bill of Rights Act, as amended, 42 U.S.C. § 6001 ("DDA"), and individuals with mental illness as defined in the Protection and Advocacy for Individuals with Mental Illness Act of 1986, as amended, 42 U.S.C. § 10801, et seq. ("PAIMIA"), and pursuant to § 51.62, Wis.Stats. WCA spends considerable time and resources monitoring conditions at various institutions providing services to people with disabilities, including developmental disabilities and mental illness, within the State of Wisconsin, and in advocating for the rights of the people residing in those institutions. At all relevant times, Audubon Health Care Center ("Audubon") and the Shores Health and Rehabilitation Center ("the Shores") are two of such facilities, or institutions.

Czaplewski is the Acting Administrator of the Shores, a facility as defined at 42 C.F.R. § 51.2 and 45 C.F.R. § 1386.19, and has sole responsibility for administering the licensed and certified facility owned by AMS Green Tree, Inc. AMS Green Tree, Inc. is a business corporation formed under the laws of the State of Wisconsin, with its principal office located in Atlanta, Georgia; it conducts business within the Eastern District of Wisconsin, including at the Shores.

AMS Properties, Inc. is a corporation organized under the laws of the State of Delaware, with its principal office located in Atlanta, Georgia; it conducts business in the Eastern District of Wisconsin, including the operation of Audubon, a facility as defined at 42 C.F.R. § 51.2.

Mariner Post–Acute Network is a partnership organized under the laws of the State of Wisconsin, with a principal office located in Atlanta, Georgia; it conducts business within the State of Wisconsin through the common operations of several subsidiary entities, including AMS Green Tree, Inc. and AMS Properties, Inc.

On October 30, 1999, John B. was a resident of Audubon. At that time Mr. B. was a 62 year old, white, married man. Mr. B. had a medical history of arteriosclerotic heart disease and mental illness. Mr. B. lived with his wife until about 1990. At that time he moved to Heartland nursing home in Milwaukee because of his medical problems. During his residence at Heartland, the symptoms of his mental illness increased to the point where he was hospitalized at Milwaukee County Mental Health Complex. He was admitted to Audubon upon his discharge from the Mental Health Complex. At Audubon his care plan required that he be assisted with eating for his safety due to a previous instance of choking.

On October 30, 1999, Mr. B. was eating lunch, unassisted, in the common cafeteria at Audubon. As a nurse saw that he was feeding himself, she took his tray away and informed other staff that he was supposed to be assisted in eating. At that time, Mr. B. stood up and the nurse noticed that his lips were turning blue.

Mr. B. was pronounced dead at approximately 2:10 PM on October 30, 1999, by Rebecca D. Reesman of the Milwaukee County Medical Examiner's Office. The autopsy determined that death was due to "Asphxia due to aspiration" or choking on food.

On or about March 19, 2000, the U.S. Health Care Financing Agency gave notice to the operator of Audubon that it was being decertified to bill Medicare and the Medical Assistance because of deficiencies in care. Shortly thereafter, the owner filed a closing plan with the Wisconsin Department of Health and Family Services ("DHFS") subject to its appeal of its termination. The operators gave notice to residents that they would have to find other arrangements for residence and other services.

Staff members of WCA participated on the team monitoring discharges during the closing of Audubon from April to May, 2000. Other members of the team included staff of Audubon, representatives of the Milwaukee County Department of Human Services, DHFS, Health Management Diagnostics Co., DHFS' agent for the purpose of monitoring services during the closing and the Ombudsman program.

During this closing process, staff members of WCA heard that one of the incidents giving rise to the decertification involved a resident who had choked to death. At the time, WCA staff did not know the identity of the resident or all the details of the incident.

On July 9, 2000, Perry J. was a resident of the Shores. Mr. J. was, at that time, a 53 year old, white man with lifelong disabilities. Mr. J. had a medical history of developmental disabilities and mental illness, including mental retardation, organic brain syndrome, obsessive-compulsive disorder, anxiety and dementia. He was also known to have a habit of grabbing any food that would be available in his reach and stuffing it into his mouth. His next of kin, an aunt, was not able to care for him due to advanced age. Mr. J. was under a guardianship and protective placement order at the time of his death. His plan of care at the Shores provided that staff were to check on his whereabouts every fifteen minutes.

Mr. J. was seen by a nursing assistant in the hall at the Shores at approximately 7:40 PM on July 9, 2000. She told him to go to the dining room and sit down. She came into the dining room to check on Mr. J. at about 8:00 PM and found him slumped over in a chair. Mr. J. was pronounced dead by Dr. J. Glaspy at 8:37 PM on July 9, 2000. The autopsy found the

cause of death to be asphyxia from food aspiration.

On or about August 8, 2000, a source of information contacted a staff member of WCA. The staff member was told that Mr. J., a man with a developmental disability and mental illness, choked to death at the Shores earlier that summer. The source indicated that negligent care was a cause of the death. As WCA staff discussed this complaint, they noted that the Shores was licensed as a skilled nursing facility. They also noted possible similarities with the death at Audubon and formed a belief that the death was probably a result of abuse or neglect. Members of the staff of WCA, including the Director of the Milwaukee office, authorized an investigation into the death of Mr. J., upon forming this belief.

A representative of WCA requested a copy of Mr. J.'s medical records on August 15, 2000, as part of its investigation of his death. On or about August 22, 2000, WCA received from counsel for the defendants a denial of its request for records. On or about August 23, 2000, WCA replied to that denial. At the same time, WCA requested other relevant records, including from the Milwaukee County Medical Examiner, the North Shore Fire Department paramedics and the Glendale Police Department. On or about August 28, 2000, WCA received a second response from counsel for the defendants denying access to any of the records requested of the defendants.

At approximately the same time, WCA secured consent from Mr. J.'s next of kin, an aunt. A copy of that consent was sent to counsel for the defendants. On or about September 7, 2000, WCA received a third response from counsel for the defendants, again denying WCA access to the requested records.

During the course of the correspondence between WCA and counsel for the defendants concerning the records of Mr. J., a staff member was able to determine the identity of the man who had choked to death at Audubon (i.e., Mr. B.), as well as

the identity of the custodian of records for Audubon. Consequently, on October 5, 2000, WCA requested in writing the records of Mr. B. from the custodian of records. That request was denied by letter dated October 17, 2000, from counsel for the defendants. That letter stated, in part, "[a]s you know, it is our position that the Wisconsin Coalition for Advocacy is not authorized under Wisconsin law to gain access to deceased residents' records." And thus was triggered this lawsuit.

In its complaint WCA asserts three claims; the first being under the Protection and Advocacy of Individual Rights provision of Part C of the DDA, 42 U.S.C. § 6042 ("PADD"), the second being under the Protection and Advocacy of Individual Rights provision of the PAIMIA, 42 U.S.C. §§ 10805 and 10806, and the third being under §§ 51.62, 51.30(4)(b) 18 and 146.82(2)(a) 9, Wis.Stats. as well as Executive Order # 19. The relief sought in all of them, however, is the same. The plaintiffs seek an order declaring that the defendants' actions in refusing to provide the requested records violate PADD, the PAIMIA and Wisconsin law. They also seek an order enjoining the defendants, their successors and any other person acting in concert with them from:

i. failing to provide to WCA any report, document, or other record relating to John B. or Perry J., including those related to their deaths and any investigation thereof; or relating to any other person who is WCA's client or whose records WCA is authorized to have access under PADD, the PAIMI Act or other federal law or pursuant to Sec. 51.62, Wis.Stats;

ii. failing to provide to WCA, its employees and agents, access to any resident, employee or agent of a defendant of facility owned, operated or managed by a defendant when required under PADD, the PAIMI Act or other federal law or pursuant to Sec. 51.62, Wis.Stats.;

iii. otherwise interfering with any investigation of abuse and neglect authorized under PADD, the PAIMI Act or other federal law or pursuant to Sec. 51.62, Wis.Stats.

In their motion for preliminary injunction, the plaintiff seeks an order preliminarily enjoining the defendants from "failing to provide to Wisconsin Coalition for Advocacy, Inc. each and every report, document, and other record relating to John B. or Perry J., including those related to their deaths and any investigation thereof [and from] failing to provide to Wisconsin Coalition for Advocacy, Inc. its employees and agents, access to any resident, employee or agent of a defendant or a person acting in concert with a defendant related to WCA's investigations of the deaths of John B. and Perry J."

## II. ANALYSIS

### A. The Standards for a Preliminary Injunction

The standards for obtaining a preliminary injunction are well established. "[T]he moving party is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). If the moving party can pass this threshold, the court will then consider any irreparable harm a preliminary injunction would cause to the nonmoving party, as well as the consequences to nonparties of granting or denying the requested relief. *Id.* at 11–12. Then, sitting as would a court of equity, the court weighs all of these factors on a sliding scale; the more likely that the plaintiff will succeed on the merits, the less the balance of harms need favor him. *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1393 (7th Cir.1992)." *Eli Lilly & Company v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir.2000). Stated in a slightly different way, "[i]n assessing whether a preliminary injunction is warranted, a

court must consider whether the party seeking the injunction has demonstrated that: 1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if the preliminary injunction is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." *Kiel v. City of Kenosha*, 236 F.3d 814, 2000 WL 1800972, *1 (7th Cir. Dec. 8, 2000)).

### B. The Defendants' Motion to Dismiss

Obviously, the question of whether the plaintiff has demonstrated a reasonable likelihood of success on the merits of its claims is, to a large degree, bundled up with the issues raised by the defendants' motion to dismiss. For if, as the defendants maintain, this court does not have jurisdiction over the plaintiff's claims and the plaintiff's complaint, in any event, fails to state a claim upon which relief can be granted, then it follows that a preliminary injunction would be inappropriate precisely because the plaintiff would not have satisfied the first of the preliminary injunction standards. Accordingly, the first matter to address is the defendants' motion to dismiss.

The defendants argue that "[i]n this case, there is no federal question, no federal controversy, and no federal case. Rather, this is a case about State law. This is a case about how the DDA and the PAIMI require participating States to delegate certain powers to protection and advocacy groups, and about how the State of Wisconsin attempted to meet this requirement by promulgating Wis.Stats. § 51.30. To the extent that the State of Wisconsin failed to delegate powers to Plaintiff which Plaintiff thinks it should have, Plaintiff's dispute is with the State of Wisconsin. However, the State of Wisconsin is not a party to this

lawsuit." (Defendants' Brief, p. 5) In other words, the defendants argue that the State of Wisconsin has not delegated to WCA the power to perform the tasks it claims to have the power to perform, such as the power to investigate claims of abuse and neglect and to have access to the records of facilities such as the defendants in order to conduct such investigations. Such being the case, the only claim that could be brought by WCA is one against the State of Wisconsin for the State's failure to carry out its responsibilities under the DDA and the PAIMIA, i.e., for failing to make the appropriate delegation of authority to WCA.

Moreover, the defendants argue that, in any event, WCA would not be able to sue the defendants under either the DDA or the PAIMIA because the defendants are private parties (not public entities) and the provisions of neither the DDA nor the PAIMIA apply to private parties. In my opinion, the defendants' arguments must be rejected and their motion to dismiss must be denied.

Disturbed by the inhumane and despicable conditions discovered at New York's Willowbrook State School for persons with developmental disabilities, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 6000, et seq., to protect the human and civil rights of this vulnerable population. *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 97 F.3d 492, 494 (11th Cir.1996). Pursuant to the Act, a state cannot receive federal funds for services to persons with developmental disabilities unless it has established a protection and advocacy ("P & A") system. 42 U.S.C. § 6042(a)(1). *Id.* The Act specifically declares: "In order for a State to receive an allotment under Subchapter II of this chapter—(1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities." 42 U.S.C. § 6042(a). P & A's must have the power, among other things, to: (1) investigate incidents of abuse and neglect of persons with developmental disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons. 42 U.S.C. § 6042(a)(2)(A) and (B). *Id.* at 494–95.

Similarly, Congress, recognizing that "individuals with mental illness are vulnerable to abuse and serious injury," enacted the PAIMIA in 1986 "to ensure that the rights of individuals with mental illness are protected" and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will ... protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes ..." 42 U.S.C. § 10801(a)(1), (b)(1), (2)(A). Under the PAIMIA, a protection and advocacy system established in a State "shall ... have the authority to ... pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and pursue administrative, legal, and other appropriate remedies on behalf of an individual who ... was an individual with a mental illness; and ... is a resident of the State, but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment." 42 U.S.C. § 10805(a)(1)(B), (C). See *Doe v. Stincer*, 175 F.3d 879, 883 (11th Cir.1999).

The State of Wisconsin receives federal funds under Parts B and C of the DDA. It is therefore required by the DDA to "have in effect a system to protect and advocate the rights of individuals with developmental disabilities[.]" 42 U.S.C. § 6042(a). In 1983, Gov. Anthony S. Earl by Executive Order # 19 designated WCA to be the Protection and Advocacy System under

Part C of the DDA.[1] Such being the case, under 42 U.S.C. § 6042(a), WCA was to be empowered to: (1) investigate incidents of abuse and neglect of persons with developmental disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons. 42 U.S.C. § 6042(a)(2)(A) and (B).[2] *J.S. Tarwater*, 97 F.3d at 494–95. WCA was also to be empowered to "have access to all records of . . . any individual with developmental disabilities .. who, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access; . . . who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and . . . with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 6042(a)(2)(I)(ii).

WCA is also the "eligible system" under the PAIMIA, see 42 U.S.C. § 10802(2) and Sec. 51.62(2), Wis.Stats. As such, it is designed to "(A) protect and advocate the rights of individuals with mental illness; and (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system . . ." 42 U.S.C. § 10803(2). Moreover, as such "system", it "shall . . . have the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure

the protection of individuals with mental illness who are receiving care or treatment in the State; and pursue administrative, legal, and other appropriate remedies on behalf of an individual who . . . was an individual with a mental illness; and . . . is a resident of the State, but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment." 42 U.S.C. § 10805(a)(1)(B), (C). As such system, it also "shall . . . in accordance with section 106 [42 U.S.C. § 10806], have access to all records of . . . any individual (including an individual who has died or whose whereabouts are unknown) . . . who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access; . . . who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and . . . with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 10805(a)(4).

WCA is empowered by § 51.30 Wis. Stats. to obtain access to treatment records of individuals with developmental disabilities or mental illness. Specifically, under § 51.30(4)(b)18., treatment records of such individuals "may be released without informed written consent . . . [e]xcept as provided in subd. 18.c. and d., to staff members of the protection and advocacy agency designated under s. 51.62(2) . . . for

---

1. Under Sec. 51.62(1)(c), " 'Protection and advocacy agency' means an entity designated by the governor to implement a system to protect and advocate the rights of persons with developmental disabilities, as authorized under 42 U.S.C. 6012 or mental illness, as authorized under 42 U.S.C. 10801 to 10851." WCA is that agency.

2. Under § 51.62(3) Wis.Stats. an agency, such as the plaintiff, has been given the power to,

inter alia, "[p]ursue legal, administrative and other appropriate remedies to ensure the protection of the rights of persons with developmental disabilities or mental illness and to provide information on and referral to programs and services addressing the needs of persons with developmental disabilities or mental illness . . . [and] . . . have access to records as specified under §§ 51.30(4)(b)18. and 146.82(2)(a)9."

the purpose of protecting and advocating the rights of persons with developmental disabilities, as defined under s. 51.62(1)(am), or mental illness, as defined under s. 51.62(1)(bm)." Subd. 18.c. and d. in turn set forth the categories of limited information that can be provided to staff members of the protection and advocacy agency and what steps need to be taken before even those limited items of information can be provided. Notably, the exceptions set forth in subd. 18c. and d. do not apply if, among other things, "a complaint is received by the agency ... about a patient, or if the agency ... determines that there is probable cause to believe that the health or safety of the patient is in serious and immediate jeopardy, the agency ... has made a good-faith effort to contact the parent or guardian upon receiving the name and address of the parent or guardian, the agency ... has either been unable to contact the parent or guardian or has offered assistance to the parent or guardian to resolve the situation and the parent or guardian has failed or refused to act on behalf of the patient ... [or] ... if a complaint is received by the agency ... about a patient or there is otherwise probable cause to believed that the patient has been subject to abuse or neglect by a parent or guardian."

In other words, close examination of § 51.30, Wis.Stats. would reveal that, under such State statute, the circumstances under which entities such as the plaintiff could gain access to the records of persons such as Mr. B. and Mr. J. might be more restrictive than the circumstances under which they could be obtained under either 42 U.S.C. § 6042 or 42 U.S.C. § 10805. Indeed, it is not clear whether, under the provisions of § 51.30, the plaintiff would even be allowed to gain access to the records under the scenarios presented in the case at bar, i.e., where the individuals have died and there is no evidence that they were "subject to abuse by a parent or guardian" but were, rather, claimed to have been subject to abuse or neglect by the facility where they were residing.

Perhaps this is why the defendants argue that it is *only* under Wisconsin state law that the plaintiff has right to obtain records of Mr. B. and Mr. J. It may also explain why the defendants argue that, if the state law does not give the plaintiff the authority it believes it should have, then its dispute is with the State of Wisconsin rather than with them.

■ Indeed, under the Wisconsin statutory scheme it does appear that WCA has less power than it has under the federal statutory scheme. For instance, as noted above, § 51.62(3)(a)1. grants to a protection and advocacy agency the power to "[p]ursue legal, administrative and other appropriate remedies to ensure the protection of persons with developmental disabilities or mental illness and to provide information on and referral to programs and services addressing the needs of persons with developmental disabilities or mental illness." Nowhere, however, does the Wisconsin statutory scheme seem to give the agency the express authority to "investigate incidents of abuse and neglect of individuals with developmental disabilities [mental illness] if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred" as the federal statutes require that they have. See 42 U.S.C. §§ 6042(a)(2)(B) and 10805(a)(1)(A). Does this mean that an agency/system such as the plaintiff does not have the authority to conduct such investigations? Of course not.

That the state statute does not expressly give the "protection and advocacy system" the power to conduct such investigations may mean *arguendo* that the protection and advocacy system is not empowered to conduct them under State law. But, it is clear that under Federal law, as soon as a State receives an allotment under 42 U.S.C. §§ 6041, any system set up in that State "to protect and advocate the rights of individuals with developmental disabilities ... must ... have the authority" to conduct such investigations. See 42

U.S.C. §§ 6042(a)(2)(B). Similarly, as soon as a State receives an allotment under 42 U.S.C. § 10804, any system set up in that State "to protect and advocate the rights of individuals with mental illness ... shall ... have the authority" to conduct such investigations. See 42 U.S.C. § 10805(a)(1)(A). Such being the case, the federal statutes clearly give the agency/system the authority to conduct such investigations.

▪ By the same token, the fact that the Wisconsin statute may not expressly grant to the agency/system the authority to "have access to all records of ... any individual (including an individual who has died or whose whereabouts are unknown) ... who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access; ... who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and ... with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse of neglect," 42 U.S.C. § 10805(a)(4), does not therefore mean that the agency/system does not have the authority to have access to such records. To the contrary, by virtue of the express terms of 42 U.S.C. § 10805(a)(4), the agency/system *has* been given the authority to have access to such records, regardless of what authority it has been given by the Wisconsin statutes. Stated another way, if there is a conflict between the federal statutes and the state statute with respect to the agency/system's authority to have access to the records of an individual with developmental disabilities or mental illness, it is the federal statutes which control. To hold otherwise would fly in the face of the Supremacy Clause of the Constitution.

In *Oklahoma Disability Center, Inc. v. Dillon Family and Youth Services, Inc.* 879 F.Supp. 1110, (N.D.Okla.1995) the court stated that "[a]ccording to the Supreme Court, there are three circumstances in which a federal law preempts a state statute. First, Congress can adopt express language setting forth preemption. Second, state law is preempted where Congress creates a scheme of federal regulation so pervasive as to leave no room for supplementary state regulation. Third, 'state law is pre-empted to the extent that it actually conflicts with federal law.' *Gade v. National Solid Wastes Mngnt. Ass'n.*, 505 U.S. 88, 109, 112 S.Ct. 2374, 2389, 120 L.Ed.2d 73 (1992), *citing English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–2275 (1992)." *Dillon,* 879 F.Supp. at 1111. Indeed, the issue in the case at bar is similar to that which was confronted by the court in *Dillon.*

In *Dillon* the court held that a state law which required a court order be issued before access to records by an advocacy system be allowed was preempted by the clear language of 42 U.S.C. § 10805(a)(4). Specifically, the *Dillon* court held that the PAIMIA "directs systems such as the ODLC [the advocacy system] to have ready access to an institution's psychiatric records so as to serve effectively as an advocate for those individuals with mental illness. Defendant's interpretation of 76 O.S. § 19 thwarts the purpose of the [PAIMIA] and serves as an obstacle to the accomplishment and execution of the purposes of [the PAIMIA]. The Supreme Court has held: 'If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ... Given the meaning of the word 'access' as used in 42 U.S.C.

§ 10805, recourse to 76 O.S. § 19 in this instance would act as an obstacle to the fulfillment of the Congressional objectives of the [PAIMIA] and is preempted to the extent it impairs the ODLC's ability to obtain the records it seeks without a court order." *Dillon,* 879 F.Supp. at 1111–12.

Similarly, in the case at bar, to adopt the defendants' argument might be tantamount to depriving the plaintiff access to the records it seeks. For, to adopt the defendants' argument would mean that the plaintiff would not be allowed access to such records unless it could show entitlement thereto under § 51.30(4)(b)18., and simply stated, it is debatable whether the plaintiff (at least at this time) could make the requisite showing under that statute. Given the clear language of the DDA and of the PAIMIA, such a result would run counter to the purposes and objectives of Congress in enacting those laws. Thus, the Wisconsin statute would in any event be preempted to the extent that it interfered with, or stood as an obstacle to, the plaintiff's having access to the records of Mr. B. or Mr. J.[3]

■ Given the foregoing, this court does have jurisdiction to hear this action pursuant to the provisions of 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States") precisely because this action does arise under the Development Disabilities Assistance and Bill of Rights Act, as amended, 42 U.S.C. § 6001 and the Protection and Advocacy for Individuals with Mental Ill-

ness Act of 1986, as amended, 42 U.S.C. § 10801, et seq.

■ Having reached that determination, the next question to address is whether, as argued by the defendants, those laws do not apply to private parties. To reiterate, the defendants argue that "[w]hile the State of Wisconsin has elected to participate in both the DDA and PAIMIA, none of the Defendants have chosen (and are not even able to choose) to directly receive federal funds under either the DDA or the PAIMIA ... According to the plain language of the DDA and the PAIMIA, these Acts only apply to States which choose to participate under the programs created by the Acts. These simply do not apply to private parties such as the Defendants in the case at bar." (Defendants' Brief, pp. 3–4)

The defendants cite no case law in support of their argument. And the court has not been able to find any which would support the defendants' argument. To the contrary, the defendant in *Dillon, supra,* was a private entity and it was ordered, pursuant to 42 U.S.C. § 10805, to produce the records of two of its former patients. To be sure, it does not appear that the defendant in that case argued that it could not be sued under the PAIMIA. But this could very well be because the defendant in that case recognized that there is nothing in the language of the PAIMIA which would suggest that a private entity could not be sued to enforce that law's provisions.

**3.** Moreover, the express language of the federal statutes demonstrate that Congress intended their provisions to preempt contrary state law. Specifically, 42 U.S.C. § 10806(b)(2)(C) reads: "If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with section 105(a)(4) [42 U.S.C. § 10805(a)(4) ] and this section, section 105(a)(4) [42 U.S.C. § 10805(a)(4) ] and this section shall not apply to such system *before*—(i) the date such system is no longer subject to such a prohibition; or (ii) the expiration of the 2–year period beginning on the

date of the enactment of this Act [enacted May 23, 1986], *whichever occurs first."* (emphasis provided)

Similarly, 42 U.S.C. § 6042(g) reads: "If the laws of a State prohibit a system from obtaining access· to records of individuals with developmental disabilities the provisions of subparagraph (A) of paragraph (2) of subsection (a) shall not apply to such system *before* —(1) the date such system is no longer subject to such prohibition; or (2) the expiration of the 1–year period beginning on the date of enactment of this Act [Oct. 31, 1990], *whichever occurs first."* (emphasis provided)

Indeed, a cursory review of 42 U.S.C. § 10802 would reveal that Congress fully intended *any* facility, whether it be publicly or privately owned, to be subject to the provisions of the PAIMIA. Specifically, for purposes of the PAIMIA, the term "abuse" is defined to mean "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with mental illness." 42 U.S.C. § 10802(1). In turn, the term " 'facilities' may include, but need not be limited to, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons." 42 U.S.C. § 10802(3). Simply stated, there no suggestion that the PAIMIA was intended to apply only to publicly owned facilities.

Similarly, there is no suggestion in the language of the DDA that its provisions are only to apply to non-private facilities. To the contrary, under 42 U.S.C. § 6042, a "system" is to have the authority to, inter alia, "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, *the rights of [individuals with developmental disabilities] within the State*" as well as to "have access at reasonable times and locations to *any resident* who is an individual with a developmental disability in *a facility that is providing services, support, and other assistance to such a resident*." (Emphasis provided)

In light of the foregoing, it follows that the defendants' motion to dismiss must be denied. And so it is.

### C. The Plaintiff's Motion for Preliminary Injunction

As stated previously, in order to be granted a preliminary injunction a movant must demonstrate "a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied.

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). If the moving party can pass this threshold, the court will then consider any irreparable harm a preliminary injunction would cause to the nonmoving party, as well as the consequences to nonparties of granting or denying the requested relief. *Id.* at 11–12. Then, sitting as would a court of equity, the court weighs all of these factors on a sliding scale; the more likely that the plaintiff will succeed on the merits, the less the balance of harms need favor him. *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1393 (7th Cir.1992)." *Natural Answers, Inc.*, 233 F.3d at 461.

### 1. Likelihood of Success on the Merits

In light of the above analysis, it is apparent that the plaintiff has demonstrated a likelihood of success on the merits of its claim, at least in so far as it seeks access to the records of Mr. B. and Mr. J. Indeed, the only argument advanced by the defendants in opposition to this first prong of the preliminary injunction test is the same argument that they advanced in support of their motion to dismiss. And that argument has already been rejected. Accordingly, whether the plaintiff will be granted a preliminary injunction will be decided on the basis of the remaining prongs of the preliminary injunction test.

### 2. Irreparable Harm and No Adequate Remedy at Law

The plaintiff argues that it will be irreparably harmed if the prayed for injunction is not granted. Specifically, WCA argues that its "declarations show how the Defendants' failure to provide the requested records causes it irreparable harm. It's [sic] ability to carry out its mandate to investigate abuse and neglect is frustrated. It bears the burden of invariable loss of memory that time abides. It bears the risk of witnesses dying, moving or otherwise becoming inaccessible. It must continue working on a file long after it should

be able to conclude its investigation using its resources. It bears the risk that potential actions which might abate or punish abuse or neglect may be lost due to the delay. Perhaps most importantly, the residents on whose behalf it must act bear the risk of injury or death." (Plaintiff's Brief, pp. 25–26)

In response, the defendants argue, first of all, that the plaintiffs' argument that the residents on whose behalf it must act bear the risk of injury or death "is completely illogical: Plaintiff cannot seriously argue that if it is prevented from reviewing deceased residents' records, the deceased residents may be injured or die." (Defendants' Brief, p. 10)

They also maintain that the plaintiff's argument concerning its inability to investigate the allegations of abuse and neglect pertaining to Mr. B. and Mr. J. should be rejected because discovery so far has shown that the "[p]laintiff's investigation into the allegations against Defendants has uncovered forty-two (42) witnesses and hundred of pages of public documents ... Thus, while Plaintiff's investigation hardly seems 'frustrated,' one could even argue that Perry J.'s and John B.'s confidential medical records are unnecessary for Plaintiff to conclude it investigation. For example, although 'a source' claims that 'negligent care' was the cause of Perry J.'s death ... there has been no allegation that such 'negligence' rose to the level of abuse or neglect as defined by the DDA or the PAIMIA. Further, Exhibit D to *Hlavacek Affidavit* demonstrates that the death of John B. has been thoroughly investigated by the State of Wisconsin. Although Exhibit D alleges that the facility did not substantially comply with the conditions of participation in the Medicare/medicaid programs, there was no allegation of abuse or neglect. Based upon the complete lack of evidence pointing to abuse or neglect of Perry J. and John B., Plaintiff should close its investigation." (Defendants' Brief, p. 11)

At its heart, the defendants' principal argument is that the plaintiff will not be harmed by its not being provided with the records of Mr. B. and Mr. J. because an investigation will reveal, if it has not already revealed, that the deaths of those two gentlemen were not the result of abuse or neglect. That may very well ultimately be the case. But, that does not really address the crux of the plaintiff's claim of harm. The plaintiff claims, and I agree, that the defendants' refusal to provide it with records that it is entitled to review (indeed, charged to review as a part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the plaintiff's being able to discharge its obligations. And no amount of damages will remedy that sustained harm. Such being the case, I am persuaded that the plaintiff has satisfied this prong of the preliminary injunction test.

### 3. Irreparable Harm to the Defendants and the Public Interest

The defendants argue that they will be injured in the following way if the court were to enter the prayed for preliminary injunction:

Defendants participate in the Medicare and Medicaid Programs, 42 U.S.C. §§ 1395 *et seq.* and 42 U.S.C. §§ 1396 *et seq.*, respectively. Pursuant to 42 U.S.C. § 1395–3(c)(1)(A)(iv) and 42 U.S.C. § 1396r(e)(1)(A)(iv), nursing homes participating in the Medicare and Medicaid Programs have the statutory obligation to protect residents' confidential information. *See also* 42 C.F.R. § 483.10(e)(i); WIS.STATS. § 51.30(4)(a); WISCONSIN ADMINISTRATIVE CODE CHAPTER HFS 92. While Plaintiff claims that defendants "allow many people to view records", ... Defendants do not allow anyone to view residents' records unless there is an exception to the general rule of confidentiality. Again, the parties' dispute as to whether Plaintiff fits within an exception to the general rule of confidentiality

is a question of State law which should be left to the State courts.

(Defendants' Brief, p. 12)

In other words, the defendants seem to be concerned that allowing the plaintiff to have access to the records of Mr. B. and Mr. J. will somehow violate the above-referenced statutory and regulatory sections and thereby, presumably, subject the defendants to some sort of regulatory/disciplinary action.

But this is not the sort of irreparable harm that counsels against the court's granting the preliminary injunction. In fact, the court's entry of the prayed for injunction would have just the opposite effect; it would prevent the defendants' sustaining any such feared "harm." In other words, it would protect the defendants from any such regulatory/disciplinary action. After all, the defendants could hardly be punished for complying with a federal court order.

Finally, the defendants argue that the public interest counsels against the entry of the injunction. Specifically, they argue that nursing home residents have a right to privacy and that there is a procedure available to the plaintiff by which it could gain access to deceased residents' records-Probate Court.

But, the defendants' argument assumes that the plaintiff does not have the right to see the deceased residents' (i.e., Mr. B. and Mr. J.) records by virtue of the DDA and the PAIMIA. Given that I have already found the plaintiff to have such right, the fact that WCA may also have the option of going to Probate Court and seeking to have special administrators appointed and obtaining informed consents from such special administrators adds nothing to the analysis. As long as the plaintiff's actions are in accord and consistent with its duties and responsibilities under the DDA and the PAIMIA, it is to have access to such records. Moreover, that it will have access to such records would not, in any event, unduly intrude upon the privacy of nursing home residents. This is because federal law requires that WCA, as the Protection and Advocacy System, keep such records confidential. See 42 C.F.R. § 51.45; 45 C.F.R. § 1386.22(e). *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 428–29 (3rd Cir. 1999).

## III. CONCLUSION

In conclusion, I am persuaded that the plaintiff is entitled to the preliminary injunction that it seeks, at least in part. I am persuaded that it is entitled to an order enjoining the defendants, their successors and any other person acting in concert with a defendant or the successor of a defendant from failing to provide to Wisconsin Coalition for Advocacy, Inc. each and every report, document and other record relating to John. B. or Perry J., including those related to their deaths and any investigation thereof.

Because there has been no evidence offered relating to that portion of the motion seeking an order enjoining the defendants from failing to provide to Wisconsin Coalition for Advocacy, Inc. access to any resident, employee or agent of a defendant or a person acting in concert with a defendant related to WCA's investigations of the deaths of John B. and Perry J., the plaintiff's motion, to the extent it seeks such an order, will be denied. I hasten to add, however, that the DDA and the PAIMIA do grant WCA the power to conduct such investigations. Such being the case, I trust that the defendants will cooperate in WCA's investigations.

**NOW THEREFORE IT IS ORDERED** that the defendants, their successors and any other person acting in concert with a defendant or the successor of a defendant are enjoined from failing to provide to Wisconsin Coalition for Advocacy, Inc. each and every report, document and other record relating to John. B. or Perry J., including those related to their deaths and any investigation thereof.

A scheduling conference to discuss the further pre-trial processing of this action will be conducted on February 5, 2001 at 9:00 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin.